PERKINS, Secretary of Labor, v. ENDI-
COTT JOHNSON CORPORATION et al.

No. 218.

Circuit Court of Appeals, Second Circuit.

Argued March 23, 1942.

Decided May 6, 1942.

Francis M. Shea, Asst. Atty. Gen., and Ralph L. Emmons, U. S. Atty., of Binghamton, N. Y. (Sidney J. Kaplan, Sp. Asst. to the Atty. Gen., and Melvin H. Siegel and Oscar H. Davis, Attys., Department of Justice, both of Washington D. C., of counsel), for plaintiff-appellant.

Howard A. Swartwood and William H. Pritchard, Jr., both of Endicott, N. Y. (John C. Bruton, Jr., of New York City, of counsel), for defendants-appellees.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. The subpoenas called for, data bearing on possible violations of the contract stipulations with reference to the tanneries, rubber, sole-cutting, counter and carton plants. As the defendants do not assert that the subpoenas were too broad if the data sought was relevant,[3] or that such data was not relevant if those plants were covered by the contract, their sole objection was that the plants were not covered. We might dispose of the case on the ground that the testimony taken by the District Court amply proved the fact of coverage, as we are inclined to believe it did. But we have not gone into that matter and do not rest our decision on that ground, since we hold that the District Court should have enforced the subpoenas, on the pleadings, without taking any testimony whatever.

2. Defendants' contentions have as their background the principle (based on constitutional and related considerations) of opposition to efforts to pry into the affairs of citizens. But such a principle of government, like almost every other principle, is not an absolute; it cannot be isolationist, living a hermit-like life, but must adjust itself when it comes in contact with other principles.[4] It is not a new judicial task to find a working compromise between the principle asserted by the defendants here and another governmental principle also deeply rooted in our legal history—that of avoiding undue complexity in, and prolongation of, litigation. ("To be effective, judicial administration must not be leaden-footed."[5]) The latter principle finds frequent expression in discouragement of interlocutory appeals. They are generally, pariahs in the federal judicial system. The "final judgment rule" goes back to the early days of the Republic,[6] and it has shown no signs of weakness in recent years. The policy behind the rule has been to discourage delays, to prevent the cluttering of appellate dockets, and to permit the correction by the trial court itself of its own errors. These purposes have much in common, and it is not surprising that the "final judgment" rule has gone hand in hand with the doctrine of harmless error.[7] As opposed to a judicial system where every technical slipup may be instantly appealed and will be automatically

---

[3] In other words, we have here no such subpœna as was involved in Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L. Ed. 696, 32 A.L.R. 786; see Cudahy Co. v. Fleming, 8 Cir., 122 F.2d 1005, 1009; McMann v. S. E. C., 2 Cir., 87 F.2d 377, 379, 109 A.L.R. 1445.

[4] Cf. dissent in Chrestensen v. Valentine, 2 Cir., 122 F.2d 511, 522, 525 (re-versed April 13, 1942, 62 S.Ct. 920, 86 L.Ed. ——) and cases there cited.

[5] Cobbledick v. United States, 309 U. S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783.

[6] Crick, The Final Judgment As a Basis for Appeal, 41 Yale L.J. 539, 549–552 (1932).

[7] See 28 U.S.C.A. § 391; for history of this statutory provision see 3 Moore's Federal Practice (1938) pp. 3285–3289.

held to be fatal,[8] ours is one in which correction is not ordinarily possible until the conclusion of the litigation, at which time only the seriously prejudicial defects will be dignified by appellate attention. The philosophy behind this practice is that many mistakes, apparently important at the time, will be seen to be trivial from the perspective of a final disposition of the case, and that disputes will therefore be more expeditiously settled. The principle is that of relatively speedy justice.

The accommodation of that principle to that on which defendants fundamentally rest their case is well illustrated in Cogen v. United States, 278 U.S. 221; 49 S.Ct. 118, 73 L.Ed. 275. There a defendant in a criminal prosecution after indictment, but before trial, applied for a summary order requiring the district attorney to return papers which he alleged had been unconstitutionally taken from him without a warrant. The Supreme Court held that he could not appeal from an order denying his application. The court recognized that the result might be that the papers, unconstitutionally seized, would unlawfully be put in evidence in the criminal trial. But it concluded that, balancing that fact against the undesirability of interfering with the orderly progress of the trial, it was better to postpone appellate consideration of the question of wrongful seizure until, should the defendant be convicted, he appealed from the final judgment in the criminal suit. A similar conclusion is reached where a witness is ordered to answer a question or to respond to a subpoena duces tecum—issued in a pending suit or in aid of a grand jury inquiry—asserting that compliance will deprive him of his constitutional rights; such an order is not ordinarily appealable. Alexander v. United States, 201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686. In Cobbledick v. United States, 309 U.S. 323, 325–327, 60 S.Ct. 540, 541, 84 L.Ed. 783, the court, dismissing an interlocutory appeal from an order refusing to quash a grand jury subpoena duces tecum, said: "The correctness of a trial court's rejection even of a constitutional claim, made by the accused in the process of prosecution must await his conviction before its reconsideration by an appellate tribunal." The reason for such a conclusion, said the court, is the desire to "safeguard against undue interruption," to avoid "obstructing the 'orderly progress'" of the main proceeding, to "protect from delay the progress" of that proceeding, to eliminate the "piecemeal disposition * * * of what for practical purposes is a single controversy * * *," thereby "enfeebling judicial administration."[9]

There are exceptions to these rules: (a) If a criminal suit is pending, but not against the person whose papers have been unlawfully seized, he is regarded as a "stranger" to the pending suit, and an action for the return of the papers is considered as "independent," so that from an order denying relief he may have an immediate appeal. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Cheng Wai v. United States, 2 Cir., 1942, 125 F.2d 915 and cases there cited. (b) Also, if a person, whether a party or a "stranger," refuses to obey a court order directing him to produce papers or to testify, and is punished for contempt, he may then maintain an interlocutory appeal. Alexander v. United States, supra; Union Tool Co. v. Wilson, 259 U.S. 107, 110, 111, 42 S.Ct. 427, 66 L.Ed. 848; Cogen v. United States, supra, 278 U.S. at page 224, 49 S.Ct. 118, 73 L.Ed. 275; Cobbledick v. United States, supra, 309 U.S. at page 327, 60 S.Ct. 540, 84 L.Ed. 783.

But it is essential to differentiate these two distinct questions: (a) immediate appealability and (b) the scope of the judicial inquiry in such cases. That, in some circumstances, an interlocutory appeal is allowed from an order directing a witness to respond to a subpoena, does not at all mean that the court, in an ancillary subpoena action, is at liberty to roam at large through all the issues in the main proceeding out of which the subpoena issues.

---

[8] See United States v. Forness, 2 Cir., 125 F.2d 928, 934ff.

[9] Where the lower court denies the government the use in a grand jury inquiry of papers alleged to have been improperly seized, the government may have an interlocutory appeal. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L. Ed. 1048, 13 A.L.R. 1159. "In Burdeau v. McDowell, the action of the district court was itself an interruption of the grand jury's inquiry; appeal by the Government did not halt the 'orderly progress' of the inquiry"; Cobbledick v. United States, supra, 309 U.S. at page 329, note 6, 60 S.Ct. at page 543, 84 L. Ed. 783.

Thus, although an interlocutory appeal is entertained from an order punishing for contempt for failure to answer questions, or produce books, in response to a subpoena duces tecum, before a grand jury, the witness cannot, either in the lower court or on appeal, attack the materiality of the information demanded, the jurisdiction of the grand jury or court over the subject matter of the inquiry, or the constitutionality of the statute. He is apparently limited to such "exceptional circumstances" as the possibility of self-incrimination, the existence of other special privileges, or the unreasonable breadth of the subpoena duces tecum. Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979.[10] The reason for such strictness is not only the historic repugnance to interlocutory interference, but also that there is a paramount "duty to disclose in a court all pertinent information within one's control" and that "the suppression of truth is a grievous necessity at best" which "can be justified at all only when the opposed private interest is supreme." L. Hand, J., in McMann v. S. E. C., 2 Cir., 87 F.2d 377, 378, 109 A.L.R. 1445.

■ When we turn to the problem of interlocutory attacks on administrative rulings—which resemble interlocutory appeals from lower to upper courts—we find that the factors operative in the historic federal opposition to such intermediate appeals have, in general, been adopted and adapted, and that they have been reinforced by a recognition that administrative bodies have been created by Congress to give "expert" and expeditious attention to their specialized fields, so that there is a reluctance on the part of the courts to interfere until the administrative agencies have finished their work.[10a] In spite of repeated efforts by respondents in administrative proceedings

to induce the courts to interfere in the early stages of such proceedings, the Supreme Court, again and again, has ruled against premature attacks. Thus, federal courts will not entertain a suit by a respondent in an administrative proceeding to enjoin the proceeding on allegations that the administrative agency is without "jurisdiction" and that to allow the proceeding to continue in such circumstances will put the respondent to needless expense. Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; Newport News Co. v. Schauffler, 303 U.S. 54, 58 S.Ct. 466, 82 L.Ed. 646; cf. Federal Power Comm. v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408; Rochester Telephone Corp. v. United States, 307 U.S. 125, 129, 130, 59 S.Ct. 754, 83 L.Ed. 1147; United States v. Illinois Central R. R. Co., 244 U.S. 82, 37 S.Ct. 584, 61 L.Ed. 1007.[11]

As above noted, there can be no interlocutory appeal from an order directing a person, not a "stranger," to testify or produce papers in a judicial proceeding, unless and until he refuses to obey the order and is punished for contempt. A different rule (stemming from historic roots) seemingly prevails where the order is to testify or produce papers in an administrative proceeding; there, seemingly, an interlocutory appeal may lie before commitment for contempt. Ellis v. I. C. C., 1915, 237 U.S. 434, 445, 35 S.Ct. 645, 59 L.Ed. 1036; Harriman v. I. C. C., 1908, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253.[12] But as the appellants in these cases were "strangers" to the administrative proceeding—as noted in the Ellis case, 237 U.S. at page 445, 35 S.Ct. 645, 59 L.Ed. 1036—the rule there applied is perhaps not out of line with the usual rule.[13]

In Cobbledick v. United States, 309 U.S. 323, 329, 330, 60 S.Ct. 540, 84 L.Ed. 783, the court, in referring to those two cases, did

---

[10] In Howat v. State of Kansas, 258 U.S. 181, 186, 42 S.Ct. 277, 66 L.Ed. 550, it seems to have been intimated that the Blair case applies also to administrative proceedings; while there have been dicta (see note 34, below) that a "full inquiry" would be possible in a proceeding to enforce an administrative subpœna, we do not (for reasons presently to be noted) take such remarks as conclusive or as necessarily implying that the recusant witness could raise any issues he chose.

[10a] Berger, Exhaustion of Administrative Remedies, 48 Yale L.J. (1939) 981.

As noted below, it is more accurate to

speak of such bodies as composed of *specialists advised by experts.*

[11] Cf. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 432–433, 60 S.Ct. 325, 84 L. Ed. 361.

[12] In both cases, appeals were allowed from orders entered upon the Commission's petitions under § 12 of the Interstate Commerce Act, 49 U.S.C.A. § 12, directing the individuals concerned to answer questions put to them in the course of proceedings before the Commission.

[13] Smith v. I. C. C., 245 U.S. 33, 38 S. Ct. 30, 62 L.Ed. 135, did not relate to a stranger; but the Commission there ap-

not call attention to the fact that they involved "strangers." It is arguable, accordingly, that by silent implication their rationale was extended to include respondents as well as "strangers." However, as discussion of those two cases was not at all necessary to the decision in Cobbledick (since they were there mentioned only to distinguish them from the issue before the court, i. e., the propriety of an interlocutory appeal from an order refusing to quash a grand jury subpoena dúces tecum), it would seem that that silent implication was, at most, dictum; we recall the warning of Chief Justice Marshall, often repeated by the Supreme Court, that "asides" or marginalia in its opinions are not to be taken as authoritative.[14] Nevertheless, we shall here assume arguendo that the Ellis and Harriman cases have been made applicable even to those who are not "strangers."

Even on that assumption, the only significant difference between the grand jury subpoena enforcement cases and a case like that at bar is that, in the former, no interlocutory appeal is allowed before the witness is committed for contempt for failure to comply with a court order to respond to the subpoena. Since the time when an interlocutory appeal may be taken by the witness has no bearing on the breadth of the judicial inquiry, the rule of Blair v. United States, supra, as to the restricted sweep of that inquiry, should, in substance, govern in the instant case. The fundamental resemblance between the grand jury and administrative investigatory proceedings has been heretofore observed by us and by the Ninth Circuit. In re S. E. C., 2 Cir., 1936, 84 F.2d 316, 318; Woolley v. United States, 9 Cir., 1938, 97 F.2d 258, 262;[15] Consolidated

Mines v. S. E. C., 9 Cir., 97 F.2d 704, 708; Cf. Note, 86 U. of Pa. L. Rev. (1938) 420, 424.

Another parallel is found in cases where a court is asked to compel production of evidence before a commissioner appointed by another court in another jurisdiction to take testimony pursuant to a dedimus. The rule governing such a case has been well stated as follows: "It is not the duty of an auxiliary court or judge, within whose jurisdiction testimony is being taken in a suit pending in the court of another district, to consider or determine the competency, materiality, or relevancy of the evidence which one of the parties seeks to elicit. It· is the duty of such a court or judge to compel the production of the evidence, although the judge deems it incompetent or immaterial, unless the witness or the evidence is privileged, or it clearly and affirmatively appears that the evidence cannot possibly be competent, material or relevant, and that it would be an abuse of the process of the court to compel its production." Dowagiac Mfg. Co. v. Lochren, 8 Cir., 143 F. 211, 215, 6 Ann.Cas. 573.[16]

As we said in McMann v. S. E. C., supra, if an administrative investigation "be duly authorized, it is no more subject to obstruction than judicial proceedings."

3. However, in the Ellis and Harriman cases, supra, the court seemingly did inquire, more broadly, into the power of the administrative agency to conduct its hearings. But there are several important factors which convince us that those cases are not determinative of the issue which confronts us in the case at bar:

(a) The administrative hearing before the court in the Harriman case was not un-

---

parently raised no objection to the interlocutory appeal and the question of the propriety of the appeal was not mentioned by the court. See Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411; KVOS, Inc., v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183.

[14] Cohens v. Com. of Virginia, 6 Wheat. 264, 339, 5 L.Ed. 257; Humphrey's Executor v. United States, 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611; Myers v. United States, 272 U.S. 52, 142, 143, 47 S.Ct. 21, 71 L.Ed. 160; O'Donoghue v. United States, 289 U.S. 516, 546, 550, 53 S.Ct. 740, 77 L.Ed. 1356; Weyerhaeuser v. Hoyt, 219 U.S. 380, 394, 31 S.Ct. 300, 55 L.Ed. 258; Taylor v. Voss, 271 U.S. 176, 185, 46 S.Ct. 461, 70 L.Ed. 889.

[15] Citing Blair v. United States, supra.

[16] Still another. parallel is Sinclair Refining Co. v. Jenkins, etc., Co., 289 U. S. 689, 697, 53 S.Ct. 736, 739, 77 L.Ed. 1449, 88 A.L.R. 496. There an action at law for damages for an infringement of a patent was at issue, but had not yet been tried. Plaintiff brought an ancillary bill for discovery of evidence relating to .the extent of damages; the defendant objected that there had been as yet no determination in the main suit that the patent was valid and had been infringed. That objection was rejected by the Supreme Court which. held that it was sufficient to show "good faith and probable cause."

dertaken pursuant to a specific complaint of any violation of the act, or upon a matter which might have been the object of such a complaint; it was solely a general investigation of railroad combinations and consolidations to aid the Commission in making a report to Congress recommending future legislation. The court construed the statute, as it then stood, in such a way that the Commission lacked any power whatever to seek court aid to compel witnesses to answer questions in such a general investigation.[17] When such a fundamental factor—a lack of all possible statutory authority to compel the witnesses to answer—is apparent on the very face of the record before the court, it should, of course, refuse to enforce the administrative subpoena.[18] Under the court's interpretation of the statute before it, the Harriman case was like Cudahy Packing Company v. Holland, March 2, 1942, 62 S.Ct. 651, 86 L.Ed. ——, where under the statute as construed by the court, the officer who signed the subpoena was a subordinate, wholly without authority to do so.[19] There is nothing comparable in the case at bar.[20]

There is no room today, we think, for differentiating actions to enforce administrative subpoenas in (a) administrative proceedings, authorized by statute, which are purely investigatory or which look merely to reports to Congress and (b) those contemplating final orders which will be judicially reviewable if adverse to the respondents therein. Were there still room for such a distinction, the instant case would come within the second category: If the final administrative order is adverse to defendants, it will render them liable for liquidated damages, and in a suit for recovery of the same, they will obtain judicial review. We need not consider the highly unlikely situation which would exist if no such suit were brought by the government or whether, in such event, defendants could bring suit for a declaratory judgment, thus procuring judicial review.[20a]

[17] Cf. I. C. C. v. Goodrich Transit Co., 224 U.S. 194, 212, 32 S.Ct. 436, 56 L.Ed. 729.

[18] We note, in passing, that in the Harriman case, there was, perhaps, an intimation that a statute conferring power on the Commission to summon witnesses by enforceable subpoenas in a hearing in aid of a report to Congress might be unconstitutional. Any such doubt was set at rest in Smith v. I. C. C., 245 U.S. 33, 44, 45, 38 S.Ct. 30, 62 L.Ed. 135, after the statute was amended to broaden the Commission's powers to conduct such investigations. And see Electric Bond & Share Co. v. S. E. C., 303 U.S. 419, 437, 438, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; cf. Bartlett Frazier Co. v. Hyde, 7 Cir., 65 F.2d 350, certiorari denied 290 U.S. 654, 54 S.Ct. 70, 78 L.Ed. 567; Federal Trade Comm. v. Millers' Nat. Fed., 60 App.D.C. 66, 47 F.2d 428.

[19] Cf. Jones v. S. E. C., 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015, discussed below.

[20] Here the powers of investigation and of the compulsion of testimony conferred upon the Secretary of Labor by section 5 of the Public Contracts Act are broader than those granted the Interstate Commerce Commission by sections 12 and 13 of its Act, 49 U.S.C.A. §§ 12, 13, as it stood at the time of the Harriman case. Section 5 of the Act before us here provides that "upon his own motion or on application of any person affected by any ruling * * * in relation to any proposal or contract involving any of the provisions of this Act [sections 35 to 45 of this title], and on complaint of a breach or violation of any representation or stipulation as herein provided [sections 35–45 of this title], the Secretary of Labor, or an impartial representative designated by him, shall have the power to hold hearings and to issue orders requiring the attendance and testimony of witnesses and the production of evidence under oath." The Secretary is also authorized by section 5 "to make such decisions, based upon findings of fact, as are deemed to be necessary to enforce the provisions of this Act [sections 35 to 45 of this title]." And section 4, 41 U.S.C.A. § 38, empowers the Secretary "to make investigations and findings as herein provided [sections 35–45 of this title], and [to] prosecute any inquiry necessary to his functions in any part of the United States." These provisions clearly contemplate investigations other than those in response to specific complaints of violation of the statute, such as investigations to determine prevailing wage or overtime rates, inquiries concerning the exceptions and modifications envisaged by section 6, 41 U.S.C.A. § 40, and perhaps general investigations into the functioning of the Act.

As above noted, Congress increased the powers of the Interstate Commerce Commission after the Harriman decision, and the expansion was treated as valid by the Supreme Court; Smith v. I. C. C., supra.

[20a] A different problem might arise if the sole sanction of the act were the "black-list" of section 3, 41 U.S.C.A. §

■ (b) The opinion in the Ellis case, so far as it relates to the scope of the judicial inquiry, is so cryptic as almost to defy analysis. A careful study of that opinion leads us to this conclusion: The issue whether a court should itself, before enforcing an administrative subpoena, go into the question of the existence of facts justifying the administrative agency in interrogating the witnesses, was not directly considered or decided by the Supreme Court. Consequently, as to that question, the Ellis case lacks precedential value. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411; KVOS, Inc., v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L. Ed. 183; cf. Quong Wing v. Kirkendall, 223 U.S. 59, 64, 32 S.Ct. 192, 56 L.Ed. 350.

(c) Almost three decades have elapsed since the Ellis case, and more than three since Harriman. We cannot blind ourselves to the obvious fact that, in that interval, the extension of administrative activities has increasingly brought to the attention of the Supreme Court the problems of the role of administrative bodies in our governmental setup, with a resultant evolution of a new judicial attitude as to their relation to the courts:[21]

(1) In the Ellis case, 237 U.S. at page 446, 35 S.Ct. 645, 59 L.Ed. 1036 stress was laid on the impropriety of administrative inquiry into "private businesses." A recession from that attitude, manifested in Smith v. I. C. C., 245 U.S. 33, 46, 38 S.Ct. 30, 62 L.Ed. 135,[22] has latterly become pronounced. Electric Bond & Share Co. v. S. E. C., 303 U.S. 419, 437, 438, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; cf. Nebbia v. People of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Olsen v. State of Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L. Ed. 1305, 133 A.L.R. 1500.[23]

(2) Today (as distinguished from 1908 and 1915) the administrative and judicial processes are specifically said to be "collaborative." United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 141-144, 60 S.Ct. 437, 84 L.Ed. 656.[23a]

(3) The importance of promptness as well as adequacy in administrative investigations (necessarily involving prompt and effective use of the subpoena power) both of specific statutory violations and of the general administration of legislation, is more fully recognized by the courts today as an indispensable condition of the effective enforcement of remedial social legislation—as appears from a comparison, for instance, of the Harriman case with Electric Bond & Share Co. v. S. E. C., supra. Cf. Miller, A Judge Looks at Judicial Review of Administrative Determinations, 1 Pike and Fisher (Articles and Reports) 223, 231, 233.[23b]

---

37, since there might, under the rule of Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108, be no way of reviewing the Secretary's action. But the Act contains provisions for both damages and a black-list. Judicial review of the former is possible, and if the findings upon which the claim for damages was based were reversed, we must assume that the Secretary would act lawfully and lift the black-list as to that contractor.

[21] Cf. Chief Justice Taft's remarks, 257 U.S. XXV-XXVI.

[22] Which distinguishes the Ellis case on the ground of a change in the statute.

[23] Moreover, the records under subpoena in the instant case are not "private"; they are of exactly the same type which, as the defendants conceded at the oral argument, they have, since 1938, been exhibiting to agents of another division of the Department of Labor under the Fair Labor Standards Act. See 29 U.S.C.A. § 211(c).

[23a] That is not to say that courts do not perform many tasks which are fundamentally "administrative"—such as corporate reorganizations, for instance—and should not, in such undertakings, have administrative assistance; cf. the advisory role of the S. E. C. under the Chandler Act, 11 U.S.C.A. § 1 et seq.

The extensive use of administrative agencies is, in part, due to the failure of the courts to utilize experts more extensively in connection with the judicial process. Over forty years ago, Judge Learned Hand pointed out that our courts had much to learn from the use in medieval England of juries of experts; Historical and Practical Considerations Regarding Expert Testimony, 15 Harv.L.Rev. 40, 45 (1901); see, also, his opinion in Parke-Davis v. H. K. Mulford Co., C.C.1911, 189 F. 95, 115.

The last word has doubtless not yet been said as to the inter-relation of courts and experts. Cf. Beuscher, The Use of Experts by the Courts, 54 Harv. L.Rev. 1105 (1941).

[23b] Cf. Merriam, The New Democracy and The New Despotism (1939), 127 cf.

(4) Today stress is laid on the doctrines of "primary jurisdiction" and "administrative finality," discussed in the Rochester Telephone Corp. case, supra, 307 U.S. at pages 139, 140, 59 S.Ct. 754, 83 L.Ed. 1147; see, also, Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. ——; Inland Steel Co. v. United States, 306 U.S. 153, 157, 59 S.Ct. 415, 83 L.Ed. 557; Moore & Adelson, The Supreme Court: 1938 Term, 26 Va.L.Rev. (1940) 697, 725-736, 754-758.

Such changes in the "climate of opinion" [24] (to use a revived meteorological metaphor[25]) should make us wary of now utilizing the latent and inarticular major premise, which may be said to underly such older cases as Ellis and Harriman, as a basis for current decisions of doctrines relative to judicial review, or preview, of the administrative determinations.[26] We would stultify ourselves and unnecessarily burden the Supreme Court if—adhering to the dogma, obviously fictional to any reader of its history,[27] that alterations in that court's principles of decision never occur unless recorded in explicit statements that earlier decisions are overruled[28]—we stubbornly and literally followed decisions which have been, but not too ostentatiously, modified. "The life of the law," as Mr. Justice Holmes said, "has been experience." Legal doctrines, as first enunciated, often prove to be inadequate under the impact of ensuing experience in their practical application.[29] And

34-33; Douglas, Democracy and Finance (1940) 1-2, 243ff; McIlwain, Constitutionalism Ancient and Modern, Chapters I and VI and Constitutionalism and The Changing World, Chapters XI, XII and XIII; Woodrow Wilson, The Study of Administration, 2 Pol.Sc.Q. (1887) 197, and Constitutional Government (1908) 56-57.

[24] Keifer & Keifer v. R. F. C., 306 U.S. 381, 391, 59 S.Ct. 516, 519, 83 L. Ed. 784. Judge Learned Hand speaks of "the changing social tensions in every society" and "new schemata of adaptations" of which judges should be aware. Sources of Tolerance, 79 U. of Pa.La.Rev. (1930), 1, 12.

[25] The history of the metaphor is illuminating. It was, Lecky tells us, coined by Joseph Glanvill, an English 17th century sceptic who published a treatise, The Vanity of Dogmatizing, in which he analyzed the distorting influences and prejudices that corrode or pervert human judgments; he urged, as the first condition of knowledge, a total abnegation of opinions received through education. And yet, himself succumbing to the climate of opinion in which he lived, he later wrote a spirited defense of the belief in witchcraft!

Glanvill's contemporaries, Locke and Francis Bacon, described the same difficulties; they were anticipated by Roger Bacon in the 13th century. For similar discussions in our time, see, e. g., Calverton, The Making of Man (1931) 24-30; Ruth Benedict, The Science of Custom, in the same volume, 805; Cardozo, The Nature of the Judicial Process (1928) 276-278; Cardozo, The Paradoxes of Legal Science (1928) 127.

It is well to note that men living in the same time and place do not necessarily dwell in the same intellectual and emotional climate. Montaigne, in the 16th century, saw through witchcraft as did others in 17th century England. And what was Leonardi da Vinci's climate?

[26] As to the need of such wariness in "tax law," where fresh doctrinal breezes are blowing, see 1 Paul, Federal Estate and Gift Taxation (1942) 50, 394.

[27] See, e. g., Warren, The Supreme Court in United States History (2d ed. 1926); every chapter shows how, in each decade of its development, old doctrines have quietly been superseded by new. See, also, Sharp, Movement in Supreme Court Adjudication—A Study of Modified and Overruled Decisions, 46 Harv.L.Rev. (1933) 361, 593, 795.

[28] See Brandeis, J., dissenting in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 404, 407, 408, note 2, 52 S.Ct. 443, 448, 76 L.Ed. 815: "Movement * * * takes place also without specific overruling or qualification of the earlier cases."

The fiction that all decisions, not expressly overruled, must somehow be reconciled, finds its analogy in the fiction of statutory "unity" encountered in Continental legal systems. See Wurzel, Juridical Thinking (in The Science of Legal Method, transl. 1921) 286, 359-367.

[29] "But, apart from the imminent risk of a failure to give any definition which would be at once perspicuous, comprehensive, and satisfactory, there is wisdom, we think, in the ascertaining of the intent and application of such an important phrase in the Federal Constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." Miller, J., in Davidson v. City of New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616. Cf. the statement of Holmes, J., in Noble State Bank v. Haskell, 219 U.S. 104, 112, 31 S.Ct. 186, 188, 55 L. Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.

when a lower court perceives a pronounced new doctrinal trend in Supreme Court decisions, it is its duty, cautiously to be sure, to follow not to resist it.[30]

Accordingly, so far as they concern the issue in the instant case, we shall treat the Ellis and Harriman cases as not controlling. It is true that they were recently cited in Cobbledick. But the reference was solely in respect of their rulings as to the time when an interlocutory appeal might be taken; the court had no occasion to and did not mention that aspect of those cases relating to the sole issue here—the breadth of the judicial inquiry, in a court action to compel a witness to comply with an administrative subpoena. That the Cobbledick case, by merely citing the Ellis and Harriman cases on the question of appealability, cannot be taken as reviving those cases with reference to that other issue—thus reinvigorating a doctrine not in accord with the more recent Supreme Court decisions, dealing more liberally with administrative agencies—is made clear by the fact that the opinion in Cobbledick was written by Mr. Justice Frankfurter who, four weeks later, wrote

the opinion in F. C. C. v. Pottsville Broadcasting Co., supra,[31] and, subsequently, the opinion in United States v. Morgan, 313 U. S. 409, 61 S.Ct. 999, 85 L.Ed. 1429.

4. In the light of such considerations, and because of the importance of the question, it is desirable to note, more in detail, why, in general, the policy against "undue interruption" should, if anything, apply even more forcibly to an administrative than to a judicial proceeding:

(a) As already suggested, one of the chief purposes of creating administrative agencies is to procure expedition. In Sunshine Coal Co. v. Adkins, 310 U.S. 381, 398, 60 S.Ct. 907, 915, 84 L.Ed. 1263, the court spoke of "flexibility and dispatch" as the "salient virtues" of the administrative process; cf. Helvering v. Wilshire Oil Co., 308 U.S. 90, 101, 60 S.Ct. 18, 84 L.Ed. 101. In Gray v. Powell, supra [314 U.S. 402, 62 S.Ct. 333, 86 L.Ed. ——], reference was made to the "advantages of prompt and definite action" by administrative bodies. The courts, therefore, do not brook delays which would destroy those virtues and advantages.[32] Had the defendants in the

---

1912A, 487, that "lines are pricked out by the gradual approach and contact of decisions on the opposing sides"; cf. Louisville Gas Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770.

"The court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." Brandeis, J., in Burnet v. Coronado Oil & Gas Co., supra, 285 U.S. at pages 407, 408, 52 S.Ct. at page 447, 76 L.Ed. 815.

"The process of inclusion and exclusion, so often applied in developing a rule, cannot end with its first enunciation. The rule as announced must be deemed tentative. For the many and varying facts to which it will be applied cannot be foreseen. Modification implies growth. It is the life of the law." Brandeis, J., dissenting in State of Washington v. W. C. Dawson & Co., 264 U.S. 219, 236, 44 S.Ct. 302, 308, 68 L.Ed. 646.

[30] To use mouth-filling words, cautious extrapolation is in order.

See The Attitude of Lower Courts to Changing Precedents, 50 Yale L.J. (1941) 1448.

No more than when courts generally are interpreting a statute should lower courts in interpreting Supreme Court decisions insist on excessive explicitness, saying, "We see what you are driving at,

but you have not said it, and therefore we shall go on as before." Cf. Mr. Justice Holmes in Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194.

[31] See, also, his opinion in, earlier, in Helvering v. Hallock, 309 U. S. 106, 119–122, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368, as to stare decisis. Cf. Frankfurter, Cardozo and Public Law, 48 Yale L.J. (1939) 458, 476–478.

[32] John Foster Dulles, before the Attorney General's Committee on Administrative Procedure, said in 1940: "The great complaint which I hear about most of these administrative bodies is that they are too legalistic, not that they are not legalistic enough. What people want is quick, efficient action. You go to a skilled surgeon and he finds a diseased spot. He takes a knife and cuts it out with expertness, sureness of touch and a minimum of suffering. The body, relieved, goes on living. That is the kind of treatment which business and financial people, with whom I come in contact, expect of an administrative body. They do not want regulations which necessitate protracted and exhausting litigation. Yet if you compel these administrative bodies, in every move they take, to make a formal court record, if you plaster them with red tape, you are doing just that. You are going in the wrong direction."

case at bar sought an injunction against the administrative proceeding, they would have failed in their effort. Cf. Federal Power Commission v. Metropolitan Edison Co., supra; Myers v. Bethlehem Corp., supra; Newport News Co. v. Schauffler, supra. Yet if the trial court's position in the instant case were tenable, the same result could be accomplished by indirection: a respondent in an administrative hearing could refuse to respond to a subpoena and, in a suit in court to compel enforcement of the subpoena, the court could do what it 'is forbidden to do under Blair v. United States, supra. The doctrine of the Bethlehem, Schauffler and Edison cases would become frivolous and lack real substance; it would relate merely to one procedural device utilized by a respondent wishing to have the courts interfere with what the Supreme Court said, in those cases, was the "exclusive initial power" of the administrative officials to investigate and determine their own jurisdiction. If defendants were to win here, they would have discovered a way of "running around the end" when blocked at the center.[33] We do not take so lightly those recent and as yet undisturbed Supreme Court decisions.

In the Bethlehem case, the court, in passing, said 303 U.S. page 49, 58 S.Ct. page 462, 82 L.Ed. 638, that, were the Board to apply to a court for enforcement of a subpoena, "to such an application appropriate defense may be made."[34] What the court meant by that statement is clarified by a similar passing comment in Federal Power Commission v. Metropolitan Edison Co., supra, 304 U.S. page 386, 58 S.Ct. 963, 82 L.Ed. 1408, for there the court cited Jones v. S. E. C., 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015. In the Jones case it was held that a citizen who filed a registration statement with the S. E. C., under the Securities Act, 15 U.S.C.A. § 77a et seq., was like a plaintiff who had begun a law suit; that, consequently, he had an unconditional right to withdraw the regis-tration statement (just as he could dismiss a law suit which he had instituted);[35] that, after he had withdrawn his registration, the proceedings begun by him before the S. E. C. terminated; and that a court was, thereafter without power to enforce a subpoena, issued by the S. E. C., relating to those proceedings which had thus properly been previously terminated by the citizen; with the withdrawal of the registration the proceeding was terminated and the investigation then "ceased to be legitimate." In re S. E. C., 2 Cir., 84 F.2d 316, 318. And so, for instance, in the case at bar, there could be no enforcement of the subpoena if the administrative proceeding had in some manner been ended.[35a]

The defendants apparently impressed the lower court with the wisdom of its course because of the hardship and inconvenience to them of requiring the production of records which might later be found immaterial; the lower court said that a "predetermination" of the issue of coverage by it was "logical" from "a practical * * * angle," because of the "saving of both time and money," desirable in "these days of stress, when the time of courts, Government officials and manufacturers is at a premium." [37 F.Supp. 604, 606.] [36] That this view was not "practical" is amply demonstrated by the record of delay in this case—one of two years and four months from the date when the subpoena suit was begun until it will terminate. We know that the trial judge is exceedingly conscientious (indeed his very conscientiousness led, we think, to his error in this case), and that unusual circumstances, occurring while this case was before him, put on him an exceptional burden of other judicial work. We deduct, therefore, the interval from the date when the suit was begun to February 1, 1941, when he entered his judgment refusing, on the pleadings, to enforce the subpoena.[37] But the time that elapsed thereafter resulted from his decision, on February 1, 1941, that there must

---

[33] Cf. International Agricultural Corp. v. Pearce, 4 Cir., 113 F.2d 964.

[34] Cf. a similar dictum in Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978.

[35] Where securities are already outstanding, a different result has been reached; Resources Internat'l v. S. E. C., 70 App.D.C. 58, 103 F.2d 929.

[35a] For other defenses which may appropriately be made at this stage, see point 5(c), page 224.

[36] The same argument has been rejected in cases like Cobbledick v. United States, supra. Cf. President of United States v. Skeen, 5 Cir., 118 F.2d 58, 59; Petroleum Exploration v. Public Service Commission, 304 U.S. 209, 222, 58 S. Ct. 834, 82 L.Ed. 1294, and the Bethlehem and Schauffler cases, supra.

[37] None of that delay is ascribable either to the judge or to counsel; a part of it was spent in an effort to settle the dispute.

be a trial of the facts as to plant coverage so that he could reach a conclusion with respect thereto. From that date until the time when our mandate is docketed, there will have been a delay of about one year and three months. Only after that period will the administrative hearing be resumed. One thinks of Jarndyce v. Jarndyce. Such Fabian methods can defeat administration.

■ (b) And here we come to another important reason why the policy against "undue interruption" applies peculiarly to administrative proceedings in suits involving the issue here: A court must not, when asked to enforce a subpoena, substitute its own for the administrative fact-finding. We have been told that it may not do so even after the administrative hearing has terminated in a final administrative decision. See, e. g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. ——. And the reasons for such decisions are more emphatically present when the administrative proceedings, as here, are still interlocutory:

■ Because administrative officers, if not always themselves experts, are *specialists, advised by experts,* in a particular field of facts, inferences drawn by those officials from the data before them are to be given unusual weight by the courts. The Supreme Court has long ascribed to their findings "the strength due to the judgments of a tribunal appointed by law and informed by experience," [38] and has said that "Congress entrusted the Board, not the courts, with the power to draw inferences from the facts." [39] It is precisely in drawing such inferences that administrative specialized skill is of unique value. It is as if a judge were reviewing a physician's diagnosis. [40]

Lawyers and judges should be the last to deny the value of a specialist's reactions, for our profession's position in society rests on the fact that we are specialists in our field. In truth, we lawyers sometimes make too much of a mystery of our methods, as did Coke when James I remarked that if "law was founded upon reason, he and others could reason as well as the judges," and Coke replied, [41] in words which many lawyers delight to quote, [42] that lawsuits "are not to be decided by natural reason, but by the artificial reason and judgment of the law, which law is an art which requires long study and experience before that a man can attain to the cognizance of it." [43] The king, an intelligent amateur, was annoyed, [44] for doubtless he saw that, as McIlwain observes, "if * * * the law was to be supreme, and at the same time a mystery open only to the initiated, it is clear that, if the claim of the lawyers was to be admitted, the supreme authority would be their exclusive possession." [45] Coke doubtless went too far, as specialists often do in attaching too much inscrutable esotericism to their own techniques. Yet his attitude, within limits, was justified; what Pound has called "the trained intuition of the judge," [46] result-

[38] Illinois Central R. Co. v. I. C. C., 1907, 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128; cf. Rochester Telephone Corp. v. United States, 307 U.S. 125, 148, 59 S.Ct. 754, 83 L.Ed. 1147.

[39] N. L. R. B. v. Link-Belt Co., 311 U. S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368; cf. Great Northern Ry. Co. v. Merchants' Elev. Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943; General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361.

[40] Cf. Landis, The Administrative Process (1938) 152ff. See Dulles' comparison, above quoted, of administrative action with that of a "skilled surgeon" who acts with "expertness," and "sureness of touch."

[41] Or so he says. There are those who doubt the authenticity of his report. It was written many years after the event, was published posthumously, and is contradicted in important respects by reports of others which were written when the events were still fresh. See Usher, The Rise and Fall of the High Commission (1913) 188–190; Usher, 18 English Hist. Rev. (1903) 664; Holdsworth, 5 History of English Law (1924) 430, 431.

[42] Cf. Pound, The Spirit of The Common Law (1921) 60, 61.

[43] 12 Coke Rep. 65.

[44] As was Hobbes; Leviathan (1651) 139.

[45] McIlwain, The High Court of Parliament, 80–81; cf. Maitland, Constitutional History of England, 301.

[46] Pound, The Theory of Judicial Decision, 36 Harv.L.Rev. 940, 951 (1923).

For other references to the use of intuition by judges, see Cardozo, The Growth of The Law, 16–17; 66–67, 70; Cardozo, The Paradoxes of Legal Science, 60, 59, 286; Cardozo, The Nature of The Judicial Process, 9, 12, 26–30, 161–162, 167–168; Dickinson, Administrative Justice and The Supremacy of Law, 133–140, 149–150, 210 note, 358; L. Hand, J., in Van Vranken v. Helvering, 2 Cir.,

ing from his experience and education, does give him, as to "questions of law," an edge over the layman.

Awareness of that truth should induce the judge to recognize his inferiority to those who are specialists, possessed of trained intuition, in matters as to which he is less experienced. For the value of the specialist is that, in dealing with a selected area of experience, he is able to make inferences quickly—because in part intuitively—and with more likelihood of accuracy than his fellow men, since many of the criteria of judgment have, with him, become semi-automatic, having been transferred, so to speak, from the conscious processes to the spinal column (or, to use highbrow terms, from the cerebral cortex to the cerebellum). He acquires unusual "insight" and "discernment" which are "the funded outcome of long familiarity with like operations in the past. Possession of this ability to seize what is * * * significant and to let the rest go is the mark of the expert, the connoisseur. * * *

Long brooding over conditions, intimate contact associated with keen interest, thorough absorption in a multiplicity of allied experiences, tend to bring about those judgments which we then call intuitive; but they are true judgments because they are based on intelligent selection and estimation. * * * "[47] Such intuitions, although seemingly "inspirational," are not anti-rational,[48] as many scientists, inventors and other specialized thinkers have pointed out.[49] It was in that vein that Mr. Justice Holmes, in a case in which a State Board's action was attacked, said that the Board's "action does not appear to have been arbitrary except in the sense in which many honest and sensible judgments are so. They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions,—impressions which may lie beneath consciousness without losing their worth." [50]

But, just as the non-lawyer can perceive gross errors in a judge's conclusions, so an administrative "diagnosis"—like that of

---

115 F.2d 709, 711; Wurzel, loc. cit. 287, 326, 364; Douglas, Democracy and Finance, Chapter XXIV; Hutcheson, The Judgment Intuitive: The Function of the 'Hunch' in Judicial Decisions, 14 Cornell L.Q. 274, 278.

Mr. Justice Holmes often commented on the intuitive factors in legal decisions. In The Common Law (1881) 1, he mentioned "intuitions of public policy" as one of the important factors in the making of legal rules. He coupled much the same statement with a reference to the need of "a special training" in Vegelahn v. Guntner, 1896, 167 Mass. 92, 44 N. E. 1077, 35 L.R.A. 722, 57 Am.St.Rep. 443. See, also, Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 465–467 (1897), reprinted in Shriver, Holmes, Book Notices, etc. (1936) 63; Holmes, Book Notice, 5 Am.L.Rev. 539 (1870) reprinted in Shriver, supra, 89, 90; Holmes, Common Carriers and The Common Law, 13 Am.L.Rev. 609 (1879), reprinted in Shriver, supra, 9, 10–11.

[47] Dewey, How We Think, 104–105. Cf. Mason, Briefing Practice of the N. L. R. B., 10 George Wash.L.Rev. (1942) 560, 579.

[48] Timberg, Administrative Findings of Fact, 27 Wash. U.L.Q. (1942) 169, 191–192; Aristotle, Posterior Analytics, Bk. II, Ch. 19, 100a, 100b, and Nicomachean Ethics, 1141a, 5.

[49] G. N. Lewis notes that much of the knowledge of the organic chemist "does

not fully emerge into his scientific consciousness, and has been called the chemical instinct." Leuba says of "scientific inspirations" that "they take place only after a period of conscious work and that they complete or continue something already begun." The great chemist, Kekule, in reporting two important discoveries as made by him "inspirationally," said, "Let us learn to dream, gentlemen. Then, perhaps, we shall learn the truth * * * but let us beware publishing our dreams before they have been put to the proof of the waking understanding." See, also, Wallas, The Art of Thought; Poincare, Science and Method, 56–63; 1 The Life and Letters of Charles Darwin, 84; Lowes, The Road to Xanadu, 61–63, 432–433. Valery, Variety, 60; W. I. Thomas, in The Unconscious, a Symposium; Santayana, Winds of Doctrine, 84–89.

[50] Chicago, B. & Q. Ry. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636; emphasis added.

He also said in the same case: "The board was created for the purpose of using its judgment and its knowledge. * * * Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law."

a physician's—may be so wanting in any possible logic that judges can say that it lacks all cogency;[51] the lack of administrative cogency, however, must be fairly gross before judges may reject the diagnosis; there is room for judicial review of administrative fact-finding, yet such judicial review, if it ignores the element of administrative "professionalism,"[52] strikes at the very reason for having administrative hearings and findings. The intention of Congress was not to have the administrative official or agency "become but a mere instrument for the purpose of taking testimony to be submitted to the courts for their ultimate action."[53]

To put it differently, the capacity of judges to determine that the inferences of a jury—a body of amateurs fortuitously assembled—are not reasonably supported by the evidence is better than their capacity to reach a like conclusion as to the inferences of a specialized administrative agency. If we were to follow Judge Learned Hand's suggestion, made many years ago,[54] and borrow from medieval practice the use of juries of experts—especially if they brought in special or "fact" verdicts—the judges would be in much the same position relative to jury verdicts as they are with reference to the findings of administrative agencies.

That does not mean that many a judge, if he had specialized in the same fields and were assisted by the same staff of experts as an administrative agency, could not be just as expert; indeed, beginning with Judge Cooley's days in the Interstate Commerce Commission, many lawyers have served as competent members of such bodies.[55] But, as Chief Judge Lehman has observed, "The judge is not presumed to have specialized training outside the law, and evidence which might be conclusive to the mind of a specialist might exercise no persuasive force upon the mind of a man

---

[51] Cf. N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586, 587, 592, where there was no evidence and no finding from which an inference could possibly be drawn that the discharge of employees (not known by the employer to be union members) in order to reinstate union employees, previously discharged, could conceivably discourage membership in a union, in violation of § 8(3) of National Labor Relations Act, 29 U.S.C.A. § 158 (3).

[52] Cf. Merriam, loc. cit., 123ff.

[53] United States v. Louisville & Nashville Ry. Co., 235 U.S. 314, 321, 35 S. Ct. 113, 114, 59 L.Ed. 245; cf. Swayne & Hoyt, Ltd., v. United States, 300 U. S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; I. C. C. v. Illinois Central R. R. Co., 215 U.S. 452, 471, 30 S.Ct. 155, 54 L.Ed. 280.

[54] Historical and Practical Considerations Regarding Expert Testimony, supra.

[55] "Because the subject matters involved are often technical in nature—superintendence of transportation, or communications, of finance, or health—it is felt that only 'experts' or 'specialists' can effectively cope with them, and hence they have been segregated from other subject matters and entrusted to administrative agencies. Now, when reference is made to the 'expert administration agency,' it is surely not intended to mean that the necessary expertness is lodged in the head or heads of the agency or that they, in their own person, possess every expertise needed for the informed discharge of the manifold duties imposed upon the modern administrative organization. It is conceivable that the heads of agencies may be experts of sorts either by reason of the training they had previously had or by reason of the specialization in the agencies' work after achieving their eminence; but it is scarcely conceivable that the heads could qualify as expert in the whole range of subjects—engineering, accounting, finance, law—involved in a determination by, say, the Federal Communications Commission. Reluctant as their friends may be to admit the fact, many agency heads are only experts ex officio. While it is with them that the responsibility for direction and supervision lies, we must look beyond the heads to find the talents which make the agency expert in its assigned tasks. This is a central reality. A pattern of administrative organization should not be created on the theory that the individuals who adjudicate are or can be the possessors of all the necessary expertise and understanding. If that theory were to prevail, the realization by an administrative agency of one of its chief raisons d'etre would be rendered almost impossible. * * * Wisdom in the complicated areas of modern governmental regulation is often necessarily the product of many minds, a synthesis of the understanding of many analysts. The administrative agency as now organized is a vehicle for bringing the judgments of numerous specially qualified officials to bear upon a single problem." Gellhorn, Federal Administrative Proceedings (1941) 27–29.

not fitted by training to comprehend it. * * * " [56] In an admirably thoughtful recent official report, entitled Administrative Adjudication in New York (1942) 211–12, Benjamin, discussing the propriety of the use by administrative agencies of their "expert knowledge and experience in evaluating and drawing conclusions from the evidence in the record," says: "The advantages of specialized tribunals, technically expert or experienced in a particular field of adjudication, will be partly lost, and desirable expedition will be sacrified, if the tribunal does not use its experience and knowledge in this way." Cf. I. C. C. v. Louisville & Nashville R. R. Co., 227 U.S. 88, 98, 33 S.Ct. 185, 57 L.Ed. 431; People ex rel. Flanagan v. Board of Police Commissioners, 93 N.Y. 97, 101. As we said several years ago: "One of the principal reasons for the creation of such a bureau is to secure the benefit of special knowledge acquired through continuous experience in a difficult and complicated field." S. E. C. v. Associated Gas & Electric Company, 2 Cir., 1938, 99 F.2d 795, 798.[57] The Supreme Court remarked just the other day: "To determine upon which side of the median line the particular instance falls calls for the expert, experienced judgment of those familiar with the industry. Unless we can say that a set of circumstances deemed by the Commission to bring them within the concept 'producer' is so unrelated to the tasks entrusted by Congress to the Commission as in effect to deny a sensible exercise of judgment, it is the court's duty to leave the Commission's judgment undisturbed"; Gray v. Powell, 314 U.S. 402, 413, 62 S.Ct. 326, 333, 86 L.Ed. ——; cf. Alton R. Co. v. United States, January 12, 1942, 62 S.Ct. 432, 86 L.Ed ——; Morgan Stanley & Co., Inc., v. S. E. C., 2 Cir., February 20, 1942, 126 F.2d 325.

Moreover, the administrative officer may properly consider evidence which would be incompetent in a judicial trial and which a court in a preview hearing would disregard.[58]

All this goes to show the impropriety of a court itself undertaking to find the facts before a full administrative hearing has culminated in final administrative findings. For the court's findings, when uninformed by the administrator, may be materially different from those which the administrator would make. Consider, for instance, what the situation might have been if in Gray v. Powell, supra, a court, asked to enforce a subpoena in the early stages of that case, had tried to decide the very question of fact as to which the Supreme Court said the final administrative determination is markedly persuasive. And the refusal of the trial court in the instant case to enforce the subpoena would, if sustained by us, render it impossible for the administrator, after completion of the administrative hearing, to make the findings to which, the Supreme Court says, the courts must pay much heed.

Similar considerations serve to answer the defendant's contention that the issue of plant-coverage in the instant case is "one of law to be determined by the court," at the threshold, because "it involves the construction of a statute." [59] Here again we have often been told to respect the attitudes of the experienced administrator, that administrative interpretations must be accorded considerable weight by the courts. Gray v. Powell, supra. In the case at bar, the court below, in interpreting the act in the early stages of the administrative proceeding, did not have the benefit of the administrator's views as to the meaning of the act as it related to the facts of the case.[60]

---

[56] Technical Rules of Evidence, 26 Col. L.Rev. (1926) 509, 511.

[57] Cf. United States Nav. Co. v. Cunard S. S. Co., 2 Cir., 1931, 50 F.2d 83, 91.

[58] Cf. 1 Wigmore Evidence, 3d Ed. 1940, 32–43; International Ass'n, etc., v. N. L. R. B., 71 App.D.C. 175, 110 F.2d 29, 34, affirmed 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; Davis, An Approach to Problems of Evidence in The Administrative Process, 55 Harv.L.Rev. (1942) 364.

[59] Of course, there was more before the court than the "construction" of the stat-

ute. There was also the issue of the "application" of the statute to the facts as they might later be found by the administrator (subject to being set aside in subsequent court proceedings, if not supported by substantial evidence).

[60] There is no need here to go into the question of how "construction" and "application" sometimes overlap, i. e., of how "construction" of a statute is, in part, a function of its "application." This is an old problem. Aristotle, Posterior Analytics, Bk. I, Ch. I. Cf. Dickinson, Administrative Justice and The Supremacy of Law (1927) 122; Berger, loc. cit.,

██ Defendants also urge that application of the Walsh-Healey Act to their tanneries, etc., would be improper because of an alleged prior inconsistent "ruling" made, as to a different company, by the acting administrator, and because of certain conduct thought to "estop" the government. Consideration of these issues has no place in such a proceeding as this; initially, the appropriate forum in which to raise them is the main proceeding.

██ 5. Defendants assert that the coverage of the tanneries and other plants was a "jurisdictional fact," as to which the administrator had made no finding, and concerning which it was, therefore, necessary for the trial court to hear evidence so that it could make a finding of fact on the subject. We reject that contention for several reasons:

(a) "Jurisdiction" and "jurisdictional" facts are mischievous words. They shed more darkness than light. Defendants in dwelling on "jurisdictional" facts, perhaps rely on Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598. Whether that decision still has its full vitality is not free from doubt;[61] it seemingly has become limited to issues of fact on which the constitutional validity of the statute depends.[62] There is no such issue here.

(b) The position of defendants boils down to this: Any fact is "jurisdictional"—and must therefore be the subject of a finding by the court in the subpoena suit —if its absence would render erroneous a final administrative decision made at the conclusion of the administrative hearing. On that basis, the issue of what constitutes an unfair labor practice under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., would be "jurisdictional" in that sense—a result which is surely erroneous.

██ (c) Even assuming, arguendo, that the fact of plant-coverage is "jurisdictional"—like the issue of interstate commerce in a Labor Board case—that issue is, initially, not for the courts but for the administrator. It cannot, ordinarily, be considered by the courts unless and until the administrative agency, after fully hearing the evidence, has decided in favor of jurisdiction. Myers v. Bethlehem Corp., supra; Newport News Shipbuilding & Dry Dock Co. v. Schauffler, supra. In those cases the Supreme Court so held with respect to the National Labor Relations Board in suits seeking to enjoin a hearing before that Board on the ground that it lacked jurisdiction.[63]

As we have seen, an administrative proceeding might, on the face of the record, be so clearly without legal foundation that a court would be obliged to refuse to enforce a subpoena issued in aid of that proceeding. Thus, if, in a National Labor Relations Board case, the Board's order or its pleadings in a suit to enforce its subpoena, affirmatively stated or admitted that the respondent employer was engaged in a business having no possible connection with interstate commerce, no court could properly order compliance with the subpoena. And the same result would follow if an administrative order for hearing under the Walsh-Healey Act, or the plaintiff's pleadings in the subpoena suit, explicitly stated (1) that the defendant was not a contractor with the government, or (2) that the

---

at 1005; Railroad Comm. v. Rowan & Nichols Oil Co., 310 U.S. 573, 580, 60 S. Ct. 1021, 84 L.Ed. 1368.

61 Cf. Note, 24 Va.L.Rev. 653 (1938).

62 Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 184, 59 S.Ct. 160, 83 L.Ed. 111; cf. South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 257, 60 S.Ct. 544, 84 L.Ed. 732; Rochester Telephone Corp. v. United States, 307 U. S. 125, 144–146, 59 S.Ct. 754, 83 L.Ed. 1147; Sunshine Coal Co. v. Adkins, 310 U.S. 381, 400, 60 S.Ct. 907, 84 L.Ed. 1263; see Moore and Adelson, The Supreme Court: 1938 Term, 26 Va.L.Rev. 697, 754–758 (1940); Stason, Timing of Judicial Redress From Erroneous Administrative Action, 25 Minn.L.Rev. (1940) 560; Larson, The Doctrine of 'Constitutional Fact,' 15 Temp.U.L.Q. (1941) 185.

63 The peculiar sanctity of "jurisdictional" issues, permitting them to be examined collaterally, has recently been much diminished. See Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104; Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85; Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329; Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297; Sunshine Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L. Ed. 1263. The newer doctrine applies to judicial but not to administrative determinations as to jurisdiction. But a similar rule applies, generally, to initial administrative determinations on that subject.

contract did not contain the required statutory stipulations, or (3) that the contract was of a kind explicitly excluded by § 9, 41 U.S.C.A. § 43, from the operations of the act.[64] Admittedly there is no such affirmative defect here.

It is, of course, true that an administrative body should not begin a proceeding unless it has made a tentative determination that the data already before it is sufficient to justify the institution of such an inquiry. Since it is presumed that officials will act properly,[65] the very institution of an administrative proceeding might be said to imply that such a tentative determination has been made. Perhaps more is required; perhaps the administrative body should make some explicit statement to that effect. That we need not decide. Nor need we decide whether, if such a statement is required, precisely how explicit it should be. One court has intimated the impropriety of the use—in a published administrative order for hearing [66]—of the phraseology that the administrative agency has "reasonable cause to believe" the facts, to be considered at the conclusion of the hearing, as a warrant for ordering the hearing; the court suggested that that traditional locution—previously used for many years by the Federal Trade Commission without judicial reproof—was too vigorous because it unfairly indicated an administrative "pretrial" judgment.[67] Without at all concurring in that criticism, we cite it because it shows that the tentative determination of the administrative agency need not be too emphatically worded.[68] Certainly, in the case at bar, the preliminary administrative statement was more than sufficient: In the amended administrative complaint served on defendants, and in the amended pleadings in the case at bar, the plaintiff stated, in effect, that the plants were covered by the contract; this was surely more than was needed to warrant the institution of an administrative proceeding to determine whether the statutory stipulations in the contract had been violated as to those plants. The trial court should have accepted that preliminary determination which must, at that stage of the proceedings, be left to the administrative official or agency.[69]

As we previously observed, the Supreme Court has said that, since courts and administrative officials are not identical but complementary, the courts are to be less strict as to the procedures of administrators than are upper courts when dealing with lower courts. Federal Communications Commission v. Pottsville Broadcasting Co., supra; United States v. Morgan, 307 U.S. 183, 190, 191, 59 S.Ct. 795, 83 L.Ed. 1211. It has also said, and often, that judges must not try to become superadministrators, substituting their judgments for those of the administrators.[70] Yet in the instant case, the court below

---

[64] E. g., that it had been made by the Secretary of Agriculture for the purchase of agricultural commodities or related exclusively to carriage of freight or passengers by a railway line where published tariffs are in effect.

The court should also consider, inter alia, such matters as whether the subpœna is too broad and vague in its terms, or that it involves an encroachment on the privilege against self-incrimination.

[65] United States v. Chemical Foundation, 272 U.S. 1, 14, 15, 47 S.Ct. 1, 71 L.Ed. 131; cf. Philadelphia & Trenton R. R. v. Stimpson, 14 Pet. 448, 458, 10 L.Ed. 535.

[66] The Federal Register Act, 44 U.S.C. A. § 301, requires publication. The particularity with which the facts should be set out in such a published order or notice need not be considered here in detail. See Monograph, Attorney General's Committee on Administrative Procedure, Part 13 (S.E.C.), 77th Cong., 1st sess., Doc. No. 10, 44–54.

[67] Bank of America Nat. Trust & Sav.

Ass'n v. Douglas, 70 App.D.C. 221, 105 F.2d 100, 105, 123 A.L.R. 1266. For a critical comment on that decision, see Note, 7 U. of Chi.L.Rev. (1939) 150; cf. comment in Part 13, Monograph of Attorney General's Committee, 46, 53.

[68] It would be enough, for instance, to say something like the following: "Having been informed by members of the staff of facts, which, if true, would justify a finding of violation, a hearing has been ordered to determine whether, etc." Substantially that is the form now used by the S. E. C.

[69] Cf. the "primary jurisdiction" concept, discussed in Inland Steel Co. v. United States, 306 U.S. 153, 157, 160, 59 S.Ct. 415, 83 L.Ed. 557 and cases there cited.

[70] See, e. g., Rochester Telephone Corp. v. United States, supra; Gray v. Powell, supra; N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 84 L.Ed. 704; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368.

was more exacting in its scrutiny of the administrator's conduct than, as an auxiliary court, it would have been of the conduct of another court. In effect, it tried the very issue of fact which Congress allotted to the administrator for trial.[71]

6. Defendants make an argument which, so far as we can understand it, rests upon an erroneous postulate, even assuming that the fact of plant coverage is "jurisdictional." If, they say, an administrative subpoena seeks records which will aid the administrative agency in passing on the question of its own jurisdiction, then the subpoena should be enforced without a hearing on evidence as to the agency's jurisdiction; but, if the subpoena seeks data unrelated to the issue of jurisdiction, then (defendants say) there must be such a court hearing as to the agency's jurisdiction. The basis for this argument seems to be as follows: The administrative agency, defendants seem to contend, must, as the very first step in the administrative proceeding, decide whether or not it has jurisdiction; if it decides that it has not, then the proceeding will end; but if it decides that it has jurisdiction, then, say the defendants, the respondent named in the administrative proceeding can promptly obtain a court review of that decision, and the court in such a review will have the benefit of the administrative finding as to jurisdiction. It is argued, however, that if the administrative agency asks enforcement of a subpoena calling for data not bearing on its jurisdiction, then presumably the agency has already decided that it has jurisdiction, for otherwise (so the argument runs) it would not be justified in seeking evidence bearing on non-jurisdictional matters; accordingly (the defendants seem to urge), the court, when asked to enforce such a subpoena, has the benefit of the agency's express or implied finding that it has jurisdiction, and the court must proceed, therefore, to determine that issue before enforcing a subpoena which will have a bearing only on post-jurisdictional issues. The fallacy of the argument is that it assumes that there is a rule that the courts invariably will entertain an interlocutory review of an administrative agency's determination that it has jurisdiction before the agency has reached its final decision on the substantive issues of the proceeding. The rule, as we

saw, is to the contrary. The defendants' contention would result in court control of the order of procedure in administrative proceedings; but the Supreme Court says that such bodies "should be free to fashion their own rules of procedure." Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656.

7. Our decision is by no means unprecedented. In Cudahy Packing Co. v. Fleming, 8 Cir., 122 F.2d 1005, 1009, it was held that a subpoena would lie for the production of records relating to employees in a plant which, it was asserted, was engaged entirely in intrastate commerce and therefore outside the jurisdiction of the administrator under the Fair Labor Standards Act; the decision was reversed by the Supreme Court, Cudahy Packing Co. v. Holland, March 9, 1942, 62 S.Ct. 803, 86 L.Ed. ——, but solely on another ground not relevant here. See, also, Fleming v. Montgomery Ward & Co., 7 Cir., 114 F.2d 384, certiorari denied 311 U.S. 690, 61 S.Ct. 71, 85 L. Ed. 446; President of United States v. Skeen, 5 Cir., 118 F.2d 58; cf. United States v. Clyde S. S. Co., 2 Cir., 36 F.2d 691. Goodyear Tire & Rubber Co. v. N. L. R. B., 6 Cir., 122 F.2d 450, 453, 136 A.L.R. 883, is perhaps distinguishable from the case at bar; if it is not, we cannot accept its holding. The same is true of Cudahy Packing Co. v. N. L. R. B., 10 Cir., 117 F. 2d 692, 694; and of General Tobacco & Grocery Co. v. Fleming, 6 Cir., February 5, 1942, 125 F.2d 596. N.L.R.B. v. New England Transportation, D.C., 14 F.Supp. 497, is not in point, since the court was concerned with the act's constitutionality, not with the Board's "jurisdiction." S. E. C. v. Tung Corp., D.C., 32 F.Supp. 371, 373, imposed the requirement of "reasonable grounds to believe," which, as we have said, may be too strict a rule; if it can be said to have required even more, we cannot follow it.

8. Although the appeal was taken according to both the simplified procedure established by the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and the former procedure, plaintiff has asked us to indicate which method is proper. We think that it would be sufficient to follow the simplified procedure of the Federal Rules, even though

---

[71] Cf. National Labor Relations Bd. v. Waterman S. S. Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 84 L.Ed. 704.

those Rules may not be fully applicable to the pre-appellate stages of this type of proceeding (Goodyear Tire & Rubber Co. v. N. L. R. B., 6 Cir., 122 F.2d 450, 136 A. L.R. 883), since it was plainly the intent of Rule 81 to extend the benefit of the streamlined appellate procedure, so far as appropriate, to such proceedings as these.

The order of the District Court is reversed and the case is remanded, with directions to enforce the subpoenas.