**WEISS et al. v. R. HOE & CO., Inc., et al.**

**No. 121.**

Circuit Court of Appeals, Second Circuit.

Feb. 19, 1940.

Hoguet, Neary & Campbell, of New York City (Thomas G. Haight, of Jersey City, N. J., and Granville M. Brumbaugh and Mark N. Donohue, both of New York City, of counsel), for plaintiffs-appellants.

Sawyer, Kennedy, Humason & · Hazell, of New York City (Cleon J. Sawyer, James J. Kennedy, and James J. Kennedy, Jr., all of New York City, of counsel), for defendants-appellees.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This litigation involves three patents to Adolph Weiss relating to rotary intaglio printing machines. Speedry Gravure Corporation ·is exclusive licensee under the Weiss patents. The defendant R. Hoe & Co., Inc., is the manufacturer and the other defendant is a user of the machines alleged to infringe. For convenience the patents in suit will be designated "first", "second" and "third" in accordance with their chronological development by Weiss. The first patent is Reissue No. 18,856, granted June 6, 1933, on an application for reissue filed September 10, 1932. It is a reissue of Patent No. 1,631,169 granted in 1927 on an application filed in August, 1924. Claims 1, 3, 4, 5, 6, 7, 15 and 16 of the Reissue Patent are in suit. The second patent is No. 2,-055,272, granted September 22, 1936 on an application filed December 7, 1932. Claims 1, 2, 5, 8, 9, 11, 22, 25, 40 and 45 of this patent are in suit. The third patent is No. 2,014,303, granted September 10, 1935, on an application filed July 22, 1933. Only claims 11 and 68 of this patent are in issue on this appeal. The district court wrote an opinion and made extensive findings of facts and law. The first patent was held invalid for lack of invention; the claims of the other patents were held invalid unless so limited as not to be infringed, except claim 68 of the third patent which was held valid but not infringed. This appeal presents the usual issues of validity and infringement.

 Rotary intaglio printing presses were old in the art before Weiss entered the field. The essential elements of all such presses are a printing cylinder and an impression cylinder between which passes the "web", that is, the paper to be printed. The words or design to be printed on the web are etched into the printing cylinder and the depressions of varying depth thus made take up the printing fluid and transfer it to the web under the pressure exerted by the two cylinders. A shallow depression gives a light tone of printing; the deeper the depression the darker is the tone. There are various methods of applying the ink to the printing cylinder, a familiar one being to rotate the cylinder in a pool of ink contained within a housing. The edge of a blade called the "doctor" is held at an angle against the printing cylinder to scrape off excess ink, leaving only that contained in the etched depressions. Weiss' first patent is for a combination of these well-known elements. Claim 1 reads as follows: "1. In a printing machine the combination of a housing for a printing fluid, a rotatable printing cylinder journaled in the housing and having configurations thereon formed by depressions extending below the outer surface thereof, a doctor blade for the machine with one end thereof bearing on the surface of the cylinder, an impression roller coacting with a web movably located between it and the periphery of the cylinder and means to maintain the housing air tight."

The novelty of this combination is said to reside in so arranging the old elements as to make the housing "air tight" and thus permit the use of highly volatile inks without the deleterious effects incident to ink evaporation. Weiss' machine came to be known as the "closed fountain" type of press; earlier intaglio presses, in which there were various closure attachments to prevent ink splashing, but no attempt to make the housing air tight, are known as the "open fountain" type.

Weiss' second patent is an adaptation of the first to a machine equipped with a reciprocating doctor.[1] Reciprocating doctors had long been used on open fountain presses to equalize the wear on the doctor blade and printing cylinder and thus prolong their operative life without repairs. The application of a reciprocating doctor to an air tight housing involved problems of closure hereafter to be discussed.

The third patent introduced two improvements to Weiss' prior constructions, one involving a means of axial adjustment of the printing cylinder, the other an improved method of supplying ink. In multicolored printing absolute registry between successive imprints is essential and to accomplish this in large presses some means of adjusting axially the printing cylinder, independently of movement of the housing, is necessary. Such adjustment was already known in open fountain presses.

For many years the great problem of the industry was to increase the speed of rotary intaglio printing. In 1924 newspaper press speeds (relief printing) in excess of 20,000 cylinder revolutions per hour were common but in rotary intaglio printing the rate of speed of large units was only 5,000 to 6,000 revolutions per hour. By 1931 it had gotten up to 8,700 revolutions in monotone printing but was still about 4,000 for multicolored work. At the date of the trial, however (1938), the speed had been increased to 24,000 revolutions per hour in monotone and 19,000 in multicolor. The defendants argue that the present press speeds have resulted from improvements in web-tensioning devices, web-pasting devices, folders, driers, blowers, heavier press frames and roller bearings as well as from the development of the closed fountain. But we think the record supports the plaintiffs' contention that Weiss' conception is entitled to the chief credit. The testimony of several witnesses to that effect is corroborated by the undisputed experience of the Alco Gravure Corporation. In 1931 it had purchased the best open fountain press then available and its maximum performance was 8,700 cylinder revolutions per hour in monotone printing and 4,000 revolutions in multicolor. In the following year Weiss was employed to convert this press into a closed fountain type embodying his inventions. When this was done, it was immediately run at a speed of 16,000 cylinder revolutions per hour—the maximum capacity of the folder with which the press was then equipped. When this folder was replaced with a standard folder of greater capacity, the press was run, without other change, at speeds of 24,000 revolutions in monotone and 19,000 revolutions in multicolor printing. These facts demonstrate the merit of Weiss' conception of using highly volatile inks and overcoming the difficulties inherent thereto by pre-

---

[1] This patent also dealt with the circulation of the ink but this subject-matter may be disregarded except in connection with claim 40.

venting ink evaporation. All recently designed presses are of the closed fountain type.

In 1923 Weiss was a manufacturer of paper cups. He used a small press to print on a continuous web that was fed to his paper cup machine and experienced difficulty in getting the ink to dry fast enough to keep up with the speed of his cup machine. This led him to try more volatile inks in an intaglio press and he encountered difficulties due to evaporation. Prior to Weiss the efforts to overcome the problems presented by evaporation in intaglio printing had been directed to means of increasing the speed of drying on the web slow-drying inks. He turned away from this solution. He perceived that highly volatile inks were necessary for high press-speeds and that evaporation must be avoided not only at the main ink body in the fountain but also in the ink on the printing cylinder before it reached the doctor, the ink in the depressions of the cylinder before it reached the paper, the ink residue in the depressions before they again received ink, and the ink wiped off by the doctor and returned to the main ink body. To accomplish this he utilized the printing cylinder itself, the doctor blade, the offside cover and the housing ends and side walls to effect a closure of the housing which would be as nearly air tight as practically possible and expose to the air only so much of the printing cylinder as was essential to an operative machine. After filing his original application in August 1924 Weiss built a small machine (Exhibit 13) that he used successfully in printing on the web that was fed to his paper cup machine. In 1926 he formed with two other men a corporation to develop the invention commercially. They built a three unit model for multicolor printing. Experiments showed that a reciprocating doctor blade instead of a stationary blade was desirable. A model of this for two-color printing was completed early in 1931. In July of 1931 this model was demonstrated to the defendant R. Hoe & Co. but no terms were arrived at with this corporation. In December 1931 Alco Gravure Corporation became interested in Weiss' inventions and caused the formation of Speedry Gravure Corporation to which Weiss granted an exclusive license. Alco also employed Weiss to embody his inventions in one of its open fountain presses. This resulted in the great increase in its productivity already mentioned. Following this success steps were taken to convert into closed fountains all the large intaglio presses at the plant of Alco, which became a sublicensee of Speedry. Shortly thereafter R. Hoe & Co. Inc. began to build presses of the type alleged to infringe.

The foregoing survey of the facts shows that Weiss' "closed fountain" machine when introduced commercially had an immediate effect upon the industry and that his patents are entitled to the benefit of such favorable inferences as the doctrine of commercial success may justify.

In retrospect what Weiss did in his first patent in suit seems simple. He merely rearranged the elements of the open fountain type of press so as to close the openings. The printing cylinder itself was used as one of the elements effecting the closure; the end walls of the housing were made to bear upon the ends of the printing cylinder which was journaled in the end walls and set low enough so that a substantial part (or a major portion, as some of the claims say) was within the enclosure. The doctor served as a sealing element on one side of the cylinder and the offside cover on the opposite side completed the enclosure. The result was the control of evaporation of the ink body resting in the bottom of the fountain and of the ink picked up on the cylinder, except so much of it as had to be exposed to the web for printing, and thus to make possible the use of highly volatile inks essential for high speed presses. The control of ink evaporation by such a closure of the fountain was an original contribution to the art of intaglio printing. But the idea of preventing the evaporation of liquids to be spread by a machine was not new. The patent to Johnson (1901) shows a machine for spreading liquid cement. Its organization is somewhat similar to Weiss. A roll or drum rotates in a housing containing the liquid cement; a scraper, corresponding in some degree to the doctor blade of Weiss, bears against the roll; on the opposite side closure is effected by a cover fitting "as close to the drum as is convenient in order to close as much as possible all openings through which air might enter or leave the tank." Other precautions against evaporation are also mentioned in the specifications. But the district judge rightly held that Johnson's cement applier was nonanalogous art. The patent to Davis (1904) for liquid-applying apparatus shows a some-

what similar structure. Although devised primarily as a gummer for putting mucilage on labels, the specifications point out that it may be used in applying any liquid—"as ink, paint, oil, etc."—to any flat surface brought into contact with the delivery roll. The Hogue patent (1916) for a trade-marking machine for marking cloth or other fabrics has a remote resemblance to Weiss and recites that one object of the machine is to prevent evaporation of the ink. As the district judge stated, no patent other than these even approaches anticipation. Nor do we think they should preclude Weiss' contribution to the art from having the quality of invention.. For years these earlier patents had existed without suggesting to anyone a practical method of using highly volatile, fast-drying inks in rotary intaglio presses. The thought of Weiss was new, ingenious, and greatly contributed to a solution of the problem of speeding up production. Walker on Patents, 6th Ed., at page 98, states that: "It may be invention to use an old * * * machine * * * for a new and non-analogous purpose." The same view has been expressed by Judge Denison in Lyman Mfg. Co. v. Bassick Mfg. Co., 6 Cir., 18 F.2d 29, 35, certiorari denied, O. K. Mfg. Co. v. Bassick Mfg. Co., 275 U.S. 549, 48 S.Ct. 86, 72 L.Ed. 420, and Lakewood Engineering Co. v. Walker, 6 Cir., 23 F.2d 623, 624. In the latter case he held that the quality of invention was present in the "conception that the old material could be employed for this new use, coupled with the (thereupon) rather obvious mechanical changes which were necessary to make practical the application of the thought." See also C. & A. Potts & Co. v. Creager, 155 U.S. 597, 607, 15 S.Ct. 194, 39 L.Ed. 275; Patent Royalties Corp. v. Land O'Lakes Creameries, 2 Cir., 89 F.2d 624, 627. Although Weiss' thought could not itself be patented, his adaptation of old means so far as necessary to give his thought practical application, renders his machine a patentable article, in our opinion.

Nor can we agree with the contention that all he did was to change the degree of closure of the open fountain type of press, whose covers to prevent splashing also prevented ink evaporation to some extent. It was more than a difference in degree; it was a difference in concept. And he modified the construction of the open fountain presses sufficiently to render his new concept practically effective. The sole purpose of the offside covers, inkguards, cylinder end hoods, and other "gadgets" employed in the so-called Hoe prior uses was to prevent splashing and leakage of ink, and whether they were left in place or removed by the pressmen, as frequently happened, they had no effect upon the speed at which the press was operated. It required a new concept as to their purpose, changes in their form and relationship, and a combination of them into a unitary structure in which the various elements should cooperate to make a substantially air tight enclosure in order to convert the open fountain presses into the machine of the Weiss patent. We hold claim 1 of the Reissue Patent valid.

If claim 1 is valid, the other claims in suit of the Reissue Patent should also be sustained. Claim 1 is the broadest claim and contains the essence of the invention. Claims 1 to 7 add no operating element but impose certain limitations of detail in construction. Claims 15 and 16 add the limitation that the doctor be adapted to swing in a vertical plane to bring its bearing edge on the surface of the cylinder and means to adjust its pressure thereon. It is contended by the defendants that claims 3 to 7 are invalid "for broadening by late reissue". The argument is that claim 1 of the original patent, which is the same as claim 1 of the Reissue, requires all of the printing cylinder, except the part necessarily exposed for printing, to be enclosed within the housing, and that claims 3 to 7 are broader than claim 1 because they state that the cylinder may be "partly enclosed therein" or "with its major portion enclosed therein." Claim 1 merely says that the printing cylinder shall be journaled in the housing. This cannot be read as a requirement that all of it be enclosed except the part exposed for printing. Claims 3 to 7 limit rather than broaden claim 1. Nor does the record show unreasonable delay in seeking to narrow his invention by reissue. Weiss learned in July 1932, after the Alco Gravure Corporation became interested, that his original patent claimed the invention only broadly. We think he acted with reasonable diligence in applying for reissue on September 10, 1932. We hold valid all of the claims in suit of the Reissue Patent.

We also hold them infringed by the press shown in the defendants' drawings and model. The claims read upon it. It is a printing machine in which there

is the combination of a housing for a printing fluid, a rotatable printing cylinder, which in substance is journaled in the housing since its axle passes through the end walls. The cylinder is etched for intaglio printing and has more than its major portion enclosed within the housing. There is a doctor blade with its wiping edge bearing on the surface of the cylinder and cooperating with the housing and cylinder to close the housing about the enclosed portion of the cylinder. There is an impression roller coacting with the web movably located between the two cylinders, and there are means to maintain the housing air tight. In the accused press these means include the offside cover, the cylinder, the "end hoods", the end hood "tail pieces", and the "ink guard" and "leather wiper" which cooperate with the doctor to complete the closure. The defendants' offside cover does not come into actual contact with the cylinder but rests about one-sixteenth of an inch away. There is also a slight space under the end hoods and a small hole for the return of ink from the ink tray to the fountain. The defendants contend that these small spaces prevent their press from being air tight and that ex parte tests (not made when the press was in actual operation) have shown that air passes in and out and there is some evaporation of the ink within the fountain. However, the fact that an infringer copies imperfectly and does not achieve the full result of the patent is not sufficient to prevent infringement where there has been substantial copying. Virginia Art Goods Studios v. Goldberg & Seltzer, 2 Cir., 76 F.2d 122. Moreover, in calling for an air tight housing, the patent does not demand a closure absolutely air tight. Cf. Chicago Fruit-House Co. v. Busch, C.C.Ill., Fed.Cas. No.2669. It means a closure as efficient as practically consistent with a proper functioning of the machine as a printing press. The defendants' press is sufficiently air tight to prevent excessive evaporation and permit the high speeds which open fountain presses cannot attain. They have taken the substance of the invention and accomplished the same results by substantially the same means. In our opinion all the claims in suit of the Reissue Patent are infringed.

Weiss' second patent discloses a combination of the air tight enclosure of his first patent with a reciprocating, instead of a stationary, doctor. Claims 1, 2, 5, 8, 9, 11, 22 and 25 relate to this subject-matter. Claim 1 reads as follows: "In a rotary intaglio printing press, the combination of an ink housing, a rotatable printing cylinder having a portion of its periphery within said housing for the application of ink thereto, wiping means comprising a reciprocable doctor knife normally in wiping engagment with said cylinder, and closure means cooperating with said doctor knife and said housing and said cylinder for preventing substantial evaporation of said ink, said closure means comprising a relatively stationary sealing element constituting a sealing extension of said doctor knife during the reciprocation thereof."

It is urged by the defendants that the substitution of an old element—the reciprocating doctor—for the stationary doctor of Weiss' first machine is not a patentable combination under the doctrine of Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008. But the introduction of the reciprocating doctor did not involve merely the substitution of one old element for another in the combination of the first patent. It created a new problem of closure and required the providing of additional elements. The reciprocating doctor had either to be shorter than the cylinder or the end walls of the housing had to be spaced away from the cylinder ends; in either case there would be openings that would destroy the closure of the fountain. Weiss spaced the end walls away from the cylinder ends and met the problem of closure by providing abutting end seals at the cylinder ends and a stationary sealing strip under the reciprocating doctor to serve as an extension of the doctor and effect a seal between the doctor and the end walls. The end seals and sealing strip were new elements, and the new combination increased the efficiency of the machine of the first patent. We should, therefore, hesitate to hold that it was not a patentable improvement unless convinced that all Weiss did was within the skill of the ordinary mechanic acquainted with the machine of his first patent. See Cantrell v. Wallick, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017. Weiss testified that he spent several years in working out his means for installing a reciprocating doctor that would maintain during its operation a substantially air tight housing, and plaintiffs' counsel point out that no other mechanic did develop the combination and that the inventor Gurwick, who saw the-

difficulties in the use of highly volatile inks, did not achieve a closure with the reciprocating doctor in his patent No. 1,-867,405 (1929). But in our view it is unnecessary to pass upon the validity of Weiss' second patent. The problem before him was narrow; it involved no broad conception, merely the devising of means of maintaining the closure of his fountain during the operation of the reciprocating doctor. He devised a particular means of effecting this result and, assuming his patent to be valid, it is limited to the means disclosed and claimed. It cannot give him a monopoly of all possible means of accomplishing the same result. In our opinion the means used in the Hoe press are sufficiently different to fall outside the range of permissible equivalents for a patent dealing with so narrow a concept.

Claim 1 calls for a "closure means comprising a relatively stationary sealing element constituting a sealing extension of said doctor knife during the reciprocation thereof." Weiss' sealing strip extends from end wall to end wall and in connection with the end seals or blocks, which constitute non-rotating extensions of the cylinder, closes the space that exists between the end of the doctor knife and the end wall. The accused Hoe press does not use end blocks and its sealing strip cannot properly be deemed an extension of the doctor knife. It is in only edge contact with the doctor holder at a relatively large distance from the edge of the doctor blade; it is nowhere in contact with the end walls. Closure is effected by means of the "end hoods", "end tail pieces" and leather wipers, the latter closing the space between the doctor and the sealing strip at approximately the end of the cylinder. The defendants' means of effecting closure on the doctor side of the cylinder do not infringe claim 1 in our opinion.

Some of the other claims in suit are phrased broadly enough to read upon the accused press. For example, claim 2 specifies "said closure means comprising a flexible closure element in sealing engagement with said doctor knife and with other adjacent closure members." But these claims must be read in the light of the disclosure of the specifications. Weiss' patent did not monopolize all possible means of effecting closure between a reciprocating doctor and the cylinder. In our opinion the defendants' means are sufficiently different to avoid infringement.

Claim 45 reads as follows: "In a printing machine, an ink fountain, an intaglio printing cylinder rotatable in the fountain, fountain components hingedly and movably secured to the fountain to substantially close the fountain around the greater portion of the cylinder and to permit the removal of the cylinder from the fountain."

This says nothing of a reciprocating doctor and adds nothing patentable to the disclosure of the Reissue Patent. We hold this claim invalid.

Claim 40 is a method claim which deals with the circulation of the ink as well as the evaporation of it. The provisions as to circulation add nothing to the disclosure of Patent No. 294,500 to Vomag and those as to evaporation add nothing to the disclosure of Weiss' first patent in suit. We agree with the district judge that claim 40 is invalid.

There remain for consideration claims 11 and 68 of Weiss' third patent. Claim 11 has to do with an improvement of Weiss' prior constructions so as to provide a means of axial adjustment of the printing cylinder. It reads as follows: "In a rotary intaglio printing press, the combination of a rotary intaglio printing cylinder, ink housing means within which is positioned a portion of the periphery of said cylinder for the application of ink thereto, said housing means and said cylinder providing an enclosure adapted to prevent substantial evaporation of the volatile ingredients from said ink, said housing means comprising a reciprocable doctor and also comprising two relatively thin arcuate members extending inwardly from respective end walls of said housing and being in sealing engagement with the peripheral surface of said printing cylinder adjacent respective ends thereof and lying between said surface and said doctor."

The novel element is the use of two relatively thin arcuate members extending inwardly from the respective end walls of the housing and overlapping the end peripheral surface of the cylinder. These made it possible to maintain closure and to adjust the cylinder lengthwise on its axis. We cannot believe that it was not within the skill of an ordinary mechanic familiar with Weiss' prior machines and desirous of providing for axial adjustment to devise such a means of maintaining the closure of the fountain. We think this claim was rightly held invalid.

Claim 68 relates to the ink circulation system. This claim was held valid but not infringed. We agree, and see no occasion to add to what was stated in Judge Knox's opinion.

In summary, we hold the claims in suit of Reissue No. 18,856 valid and infringed; claims 40 and 45 of Pätent No. 2,055,272 invalid, and the other claims in suit of that patent not infringed; Claim 11 of Patent No. 2,014,303 invalid and Claim 68 of that patent valid but not infringed. The decree appealed from should be modified in accordance with this opinion, and the case is remanded with directions so to do. One-half the appellate costs are awarded the appellants.