## AERO SPARK PLUG CO., Inc., v. B. G. CORPORATION.

### No. 319.

Circuit Court of Appeals, Second Circuit.

Aug. 14, 1942.

Lucius E. Varney and Nichol M. Sandoe, both of New York City, for plaintiffs-appellants.

Harry A. Yerkes, Jr., of New York City (Lee B. Kemon, of Washington, D. C., of counsel), for defendant-appellee.

Before SWAN, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The decree was based upon two grounds, non-infringement and invalidity of Claim 2, which is the only claim in issue.

Kasarjian's patent involves spark plugs for use in airplane engines. The usual aviation spark plug assembly has a core in the center consisting of a metal rod or spindle. The lower end of this spindle constitutes one of the electrodes at the spark gap, and therefore the whole must be insulated from the other electrode known as the ground electrode. Because of the intense heat in aviation engines, mica is used as an insulator. Several thin laminations of mica are first wound around the spindle. This is known as the mica "cigarette." About midway on this "cigarette" is a tight-fitting brass bushing to hold it in place on the spindle. Above the bushing, and sometimes both above and below it, is placed a stack of mica washers the inner circumference of which fits snugly around the "cigarette." This constitutes the insulation of the center electrode.

An extremely high voltage is required in aviation engines to create a satisfactory

spark in the cylinder because of the high compression of the explosive mixture. It had been found that occasionally a plug would miss fire because there would be a parasitic discharge or flashing within the insulation rather than at the spark gap where resistance was high. This flashing occurred in the slight air space between the mica "cigarette" and the mica washers, and the explanation for it was that in some plugs this air between the "cigarette" and washers became ionized from the leakage of the high voltage electricity and the ionization deprived the air of its usually good insulating properties with the result that there was less resistance offered the discharge through this path than across the spark gap. All this was known to the prior art, and it was while seeking to eliminate this parasitic discharge that Kasarjian invented the new construction which he patented.

■ Although Kasarjian calls this parasitic discharge or flashing a "corona discharge" which is technically an incorrect term, that is relatively unimportant for there can be no doubt from his specifications that what he means is this jump spark which causes the engine to miss fire. A patentee may use such terms as to him best describe what he means and when he thus makes his meaning plain it will be given effect. Cf. H. J. Wheeler Salvage Co., Inc. v. Rinelli & Guardino, Inc., D.C., 295 F. 717, 727.

■ Claim 2 of the patent calls for an aviation spark plug of the usual sort "and means for precluding corona discharges through the plug comprising an insulating refractory substance filling the air pockets within the insulating element to exclude residual air from said element." A reading of this claim leaves no doubt but that Kasarjian's theory was to exclude all the air so that none could become ionized and afford a path for the flashing. This was to be done by displacing all the air with a liquid or semi-liquid refractory substance such as liquid porcelain. That the gist of his invention was to exclude all air and prevent the discharge in that way is repeatedly evidenced by his specifications. On page 1 at line 102 says, "I find it essential to the carrying out of this invention that the presence of air pockets within the plug structure be eliminated and thus according to this invention, the presence of air within the plug structure is eliminated by the actual filling of all spaces within the plug structure with a suitable substance

of high di-electric value under the temperatures prevailing in the plug during operation." Page 1, line 91: "I have discovered that by eliminating these air pockets, the silent or coronar discharge within the plug structure is entirely eliminated * * *" The scope of every patent is limited to the invention which is covered in the claims read in the light of the specifications. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Keith v. Charles E. Hires Co., 2 Cir., 116 F.2d 46, 49. And when claim 2 is so read there is no doubt that the only advance from the old to be found in Kasarjian's construction of the spark plug is that all the air spaces be filled with a refractory insulating substance.

■ Assuming, without deciding, that claim 2 is valid, we agree that infringement has not been shown. The general structure of the accused plug is that of the conventional aviation spark plug, but in it the parasitic discharge is prevented by placing a refractory substance at only two places, one just above and one just below the brass bushing which holds the mica "cigarette" in place. In actual practice this is done by placing a small amount of the refractory cement in the shape of a doughnut around the "cigarette" at either end of the bushing. The washers are then pressed on and the whole is then compressed as part of the usual assembly method. The theory is that these refractory "doughnuts" will act as an insulating barrier to prevent either the leakage of electricity or parasitic discharge regardless of the presence of air which in the patented construction has been excluded. No effort is made to fill the air spaces completely and that result is not attained. The purpose and the final end of both methods are to prevent flashing, but with that their similarity ends. To eliminate harmful air spaces is one thing and to make the residual air in such spaces harmless is quite another and so different a method that it does not infringe. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136; E. Van Noorden Co. v. Cheney Co., 1 Cir., 75 F. 2d 298, 302.

The appellant relies on Weiss v. R. Hoe & Co., Inc., 2 Cir., 109 F.2d 722, where the patentee taught the use of an "air-tight" structure in an ink fountain for printing presses, and where this court found infringement in a structure that was not entirely air-tight. But in that case it was

said that in the light of the specifications of the patent there "air-tight" meant only as complete a closure as was practicable. The accused fountain took the substance of that invention and copied it imperfectly. There is no analogy in this case where the accused plug has attained the goal not by an imperfect copy, but by a different method; not by eliminating the air spaces but by blocking them off into harmlessness by effective insulation.

■ Since there is no infringement even if the patent be valid, we do not decide the question of validity. See S. S. Kresge Co. v. Davies, 8 Cir., 112 F.2d 708, 711. But cf. dissent in Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 137, 62 S.Ct. 513, 86 L.Ed. 736.

Affirmed.

FRANK, Circuit Judge (concurring).

I concur. But I think we should also hold the patent invalid. That issue was squarely raised in the court below and in this court. When such an issue is raised, and when the patent is invalid, I think it is our duty so to decide. In Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, a majority of the court refused to consider whether a patent was invalid for want of invention while holding there was no infringement; but that refusal was explicitly rested on the sole ground that the issue of lack of invention was not before the court as it had been raised by the alleged infringer neither in its petition for certiorari nor in its brief filed in the Supreme Court. That, however, is unlike the situation here.

As we said recently in Picard v. United Aircraft, 2 Cir., May 28, 1942, 128 F.2d 632, 636, "there is more at stake [in a patent case] than the issues between the two parties." The decision of my colleagues relieves appellee, but leaves appellant free to sue others as alleged infringers, putting them to the expense—notoriously great in patent suits—of defending themselves. It is well known, too, that threats of such suits, because of that expense, often induce alleged infringers to accept licenses on onerous terms rather than to engage in litigation. As the exercise of a patent monopoly is publicly injurious when an invalid patent remains at large, the public interest is, therefore, deeply involved. And as, under the existing patent statute and decisions, no one, on behalf of the public, can institute a suit to have a patent declared invalid, we should, I think, avail ourselves of this opportunity to wipe out the patent here.

That it is invalid seems clear in the light of Picard v. United Aircraft, supra. The appellee's brief in the instant case states that the patentee hit on the use of the refractory material "only as a last resort," and adds, "Indeed, as it proved to be, it was not a problem solvable by deduction but only by experimentation; and, as often happens, it was solved in the end by trying something that did not seem practicable." That statement brings the patentee's method directly within the description of what this court, the other day, held not to constitute invention. See Picard v. United Aircraft, supra, where we said (per Judge L. Hand) that nothing is an invention which is the product of "the slow but inevitable progress * * * through trial and error" and of "the exercise of persistent and intelligent search for improvement."[1] There was here no "new display of ingenuity beyond the compass of the routineer"; Kirsch Mfg. Co. v. Gould Mersereau Co., 2 Cir., 6 F.2d 793, 794.[2]

It has been said that, where there is a decision of no infringement, the better practice is for a judge to leave "the legal status of the * * * patent as he had found it, clothed with the presumption of validity arising from the fact of the grant." Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951; Shakespeare Co. v. Perrine Mfg. Co., 8 Cir., 91 F.2d 199, 200; S. S. Kresge Co. v. Davies, 8 Cir., 112 F.

---

[1] As I pointed out in a concurring opinion in that case, that test has the virtue of reducing the area of subjectivity in deciding what is an invention. As to the subjective factor, see Kirsch Mfg. Co. v. Gould Mersereau Co., supra.

In deciding whether or not there was something more than "the exercise of persistent and intelligent search for improvement," courts should be careful not to rely too much on their own reactions, for the fact that a device "may seem remarkable, or new, or profound, to lawyers or to the public generally, is not sufficient to constitute invention." Radtke Patents Corp. v. Coe, 74 App.D.C. 251, 122 F.2d 937, 946, certiorari denied 314 U.S. 695, 62 S.Ct. 411, 86 L.Ed. —; cf. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 437, 22 S.Ct. 698, 46 L.Ed. 968.

[2] It may be noted that here there was no need for the investment of large sums to bring the device to the stage of practical commercial use.

2d 708, 711. I cannot agree. That conclusion would be sound if at all, only if there were no public aspect to a patent.

It is true that, in ordinary private litigation, courts sometimes confine their decisions narrowly, and, if one point is sufficient to support a decision, other points are not discussed. Even if that could be said to be the usual practice, it loses much of its pertinence in patent cases. A patent is a "public franchise,"[3] a legalized monopoly. To allow a patent to remain apparently valid when the issue of invalidity is raised and the court sees that the patent is invalid, is to ignore the paramount public interest.[4] Because no representative of the public may institute a suit to have a patent held invalid, and because the courts have no staff of independent experts to aid them in patent suits, the courts must, in most cases, rely on the litigants in ascertaining the prior art. But when, in a patent suit, the court is aware of a prior art which shows no invention, and that issue is raised by one of the parties, the public interest would seem to require that the court should so decide.

Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263, decided that it is improper for a court, after holding that there is no infringement, to hold the patent valid; and it reversed a decision of this court in which we refused to direct the District Court to reform its decree by expunging that part of it which sustained validity. For to hold a patent valid, if it is not infringed, is to render a mere advisory opinion, to decide a hypothetical case. The crucial fact in the Electrical Fittings Corp. case was that a finding of validity in no way aided the plaintiff's position or weakened the defendant's, as to the cause of action sued upon. It could not conceivably have been used as a ground of decision, either alone or as an alternative to another ground. But a holding of invalidity is entirely different. It is an alternative ground of decision; a complaint can be dismissed either because of invalidity or because of non-infringement. If a court chooses to avail itself of one possible ground rather than another, does it commit reversible error? Suppose the issue of infringement is difficult. Cannot we decide on the other ground? But, even if both are clear grounds, what rule confines us to one rather than the other?[4a] If it be said that a finding of non-infringement will obviate passing on validity, it can be said with equal accuracy that a finding of invalidity will obviate passing on infringement. And, just as a finding of validity will require us to pass on to the issue of infringement, so a finding of infringement will require us to pass on to the issue of validity. So far as judicial economy is concerned, we are no more likely to save judicial effort by looking to infringement first than by looking to validity first, unless there is some greater likelihood that a patent will be not infringed than that it will be invalid. My guess would be that invalidity is more common than non-infringement. And, of course, a finding of invalidity reduces judicial effort, for it prevents further suits by the patentee as to other persons; a finding of non-infringement does not.

All that the Supreme Court held in the Electrical Fittings case was that, if there is a decision of non-infringement, there cannot properly be a decision of validity. In Irvin & Co. v. Westinghouse Air Brake

[3] Seymour v. Osborne, 1870, 11 Wall. 516, 533, 20 L.Ed. 33. Cf. United States v. United Shoe Machinery Corp., 1922, 258 U.S. 451, 463, 42 S.Ct. 363, 66 L. Ed. 708; Kendall v. Winsor, 1858, 21 How. 322, 327, 328, 16 L.Ed. 165; Bloomer v. McQuewan, 1852, 14 How. 539, 549, 14 L.Ed. 532, cited with approval in United States v. Univis Lens Co., Inc., May 11, 1942, 62 S.Ct. 1088, 86 L.Ed. ——; Meyers and Lewis, The Patent "Franchise" and The Antitrust Laws, 30 Georgetown L.Rev. (1941) 117, 123.

[4] As to the public interest, see Morton Salt v. G. S. Suppiger Co., 314 U.S. 488, 489, 62 S.Ct. 402, 86 L.Ed. 363; United States v. Univis Lens Co., supra; United States v. Masonite Corp., May 11, 1942, 62 S.Ct. 1070, 86 L.Ed. ——; Dens-more v. Scofield, 102 U.S. 375, 378, 26 L.Ed. 214; Kendall v. Winsor, 62 U. S. 322, 328, 329, 21 How. 322, 16 L.Ed. 165; Picard v. United Aircraft Corp., supra.

[4a] It may be suggested that the issue of infringement is primary because the plaintiff must show that his rights have been invaded. But, unless he has a valid patent, he has no rights in the device which an infringement can invade. In a suit for trespass to land, the plaintiff must show both (a) that he has title to the land and (b) that the defendant has trespassed on that land; there is no rule that the court must first consider the defendant's conduct; indeed, if either issue were to be regarded as primary, it might well be that of plaintiff's title.

Co., 2 Cir., 121 F.2d 429, we reversed a judgment declaring the patent invalid where the judgment had also held the patent not infringed. We did not say that a court must pass on infringement before going on to validity, and that it would be improper to rely on invalidity without passing on infringement. We did say, however, that, where there are two grounds, the court cannot employ both. If, then, the District Court in that case employed solely invalidity, it might well have been sustained.

If the point decided in the Irvin case were still open, I would be for deciding it the other way. It is, indeed, perhaps still open (or it has been opened and closed in a new way); for this court, in Hazeltine Corporation v. Emerson Television-Radio, Inc., 2 Cir., July 29, 1942, 129 F.2d 580, has just rendered an opinion in which, after holding a patent not to be infringed, it went on to say that, "even had we come to a different conclusion as to infringement, the decree would have to be affirmed" because of the patent's invalidity. In any event, the ruling in the Irvin case should not be extended so that a court must, in all cases, select one rather than another ground of decision, since, even in saying that a court cannot, in a patent case, decide on two grounds, the Irvin case is not supported by the Electrical Fittings case (cited in the Irvin case as controlling), and it is out of line with our everyday practice, in ordinary suits, of giving several grounds of decision when we so choose.

It is true that where a case presents both a constitutional and another ground of decision, courts often (and properly) prefer to avoid the constitutional issue if they can. That practice is far from crystallized into a rule that it is reversible error to rely on unconstitutionality alone, or to rely both on unconstitutionality and on a non-constitutional ground. And even as a practice, it is plainly inapplicable to patent cases: A finding of unconstitutionality is a grave step because it involves a nullification of the action of the legislative branch of the government; wherefore courts should shrink from facing that issue, and should side-step it so far as possible. In this it is comparable with Supreme Court jurisdiction over state decisions alleged to invade a federal right; the federal issue must be necessarily presented. There is no such sanctity attached to a patent's validity. The presumption arising from its issuance by the Patent Office is a faint one.[5] An invalid patent masquerading as a valid one is a public menace, and should be fair game.

It is no adequate answer to say that courts should not concern themselves with the protection of persons not parties to suits pending before them. The fact is that courts daily do so concern themselves, and in circumstances where the desirability of doing so is far less obvious than here and the means far less effective. Because I think that to hold invalid a patent which is obviously void is a matter of major public importance, I think it desirable to elaborate that point:

Perhaps the central theme in most discussions of the judicial process is the obligation of judges to consider the future consequences of their specific decisions. Such discussions usually stress the "rule" or precedent aspect of decisions. Thus Dickinson, in 1927, paraphrasing (it may be unconsciously) Aristotle's remarks made almost twenty-two hundred years earlier,[6]

---

[5] This is true because, often, the Patent Office was not thoroughly acquainted with the prior art. Cf. Western Auto Supply Co. v. American-National Co., 6 Cir., 114 F.2d 711, 713; Cutler Mail Chute Co. v. Capital Mail Chute Corp., 2 Cir., 118 F.2d 63, 64; Lempco Products v. Timken-Detroit Axle Co., 6 Cir., 110 F.2d 307, 310.

The doctrine that quasi-judicial administrative determinations of fact are entitled to great weight has and should have little bearing on the findings of the Patent Office, because its hearings are not public (interested third persons having, except to a limited extent in "interference" proceedings, no opportunity to be heard) and because of the nature of Patent Office procedures generally. See Hamilton, Patents and Free Enterprise (T. N. E. C. Monograph, No. 31) 123-127; Woodward, A Reconsideration of the Patent System as a Problem of Administrative Law, 55 Harv.L.Rev. 950 (1942). Cf. Rosenberg v. Groov-Pin Corp., 2 Cir., 81 F.2d 46, 47, 48. But cf. Williams Mfg. Co. v. United Shoe Machinery Corp., 6 Cir., 121 F.2d 273, 276.

[6] "Next, laws are made after long consideration, whereas decisions are given at short notice, which makes it hard for those who try the case to satisfy the claims of justice and expediency. The * * * decision of the lawgiver is not particular but prospective and general, whereas members of the [court] find it their duty to decide on definite cases brought before them. They will often have allowed themselves to be so much influenced by feelings of friendship or

writes, "One danger in the administration of justice is that the necessities of the future and the interest of parties not before the court may be sacrificed in favor of present litigants"; he thinks it imperative that judges should "raise their minds above the immediate case before them and subordinate their feelings and impressions to a practice of intricate abstract reasoning, * * * centering their attention on a mass of considerations which lie outside the color of the case at bar." [7]

Although much can be said for that attitude—of considering a decision primarily with reference to its significance in future cases—it is sometimes given too much weight. Excessive concentration of attention, by some upper court judges, on the formulation in their opinions of so-called legal rules, with an eye chiefly to the impact of those rules on hypothetical future cases not yet before the court, sometimes results in their allotting inadequate attention to the interests of the actual parties in the specific existing cases which it is the duty of courts to decide. Such judges never quite catch up with themselves; for, in cases which actually occur, they are deciding future cases that may never occur. Legal history shows that such an attitude leads to judicial pronouncements which, at times, are none too happy in their effects on future cases. For the future develops unanticipated happenings; moreover, it does not stay put, it refuses to be trapped.

The intended consequences of efforts to govern the future often fail; the actual consequences—which may be good or evil—are, frequently, utterly different. Results are miscalculated; there is an "illusion of purpose." [8] Of course, present problems will be clarified by reference to future ends, but, as I have elsewhere suggested, such ends, although they have a future bearing, must obtain their significance in present consequences, otherwise those ends lose their significance. For, it is the nature of the future that it never arrives. "Tomorrow today will be yesterday." Any future, when it becomes the present, is sure to bring new and unexpected problems. [9] There is much wisdom in Valery's reference to the "anachronism of the future."

And the paradox is that when judges become unduly interested in the future consequences of their rulings, they are (as Walter Bingham pointed out years ago) doing precisely what they say they must avoid—they are deciding not real but hypothetical cases, with no one present to speak for the imaginary contestants. [10] The interests of the parties to cases actually before the court are thus sacrificed to the shadowy unvoiced claims of supposititious litigants in future litigation which may never arise; and the judicial process becomes the pursuit of an elusive horizon which is never reached. No one—except perhaps those judges—is satisfied, since the interests of the parties to real present cases are overlooked, and the interests of the parties in subsequent cases are often inadequately determined in their absence. No doubt it expands the ego of a judge to look upon himself as the guardian of the general future. But his more humble yet more important and immediate task is to decide individual, actual, present cases. The exaggerated respect paid today to upper court judges, as distinguished from

---

hatred or self-interest that they lose any clear vision of the truth and have their judgment obscured by considerations of personal pleasure or pain. In general, then, the judge should, we say, be allowed to decide as few things as possible. But questions as to whether something has happened or has not happened, will be or will not be, is or is not, must of necessity be left to the judge, since the lawgiver cannot foresee them." Aristotle, Rhetoric, Bk. 1, Ch. 1, 1354b; cf. Bk. 1, Ch. 2, 1356b, 31-32.

[7] In a somewhat similar vein, Mr. R. Cohen writes that the "fact that every case is presented as an issue between two parties" is "a circumstance about our judicial system which is always tending to produce an inadequate view of social justice * * * A judge looking only to the interests of the two parties before him is apt to forget that his decision will affect countless others who are not present and whose circumstances are not at all identical. Human society is not so organized that a dispute between A and B can be of no concern to anybody else." Law and The Social Order (1933) 144. See also, Salmond, Introduction to The Science of Legal Method, lxxv, lxxvi, lxxx, lxxxiv.

[8] Cf. Berolzheimer, The World's Legal Philosophies (transl.) XLIII–XLIV, 114, 142, 168, 350, 435; Kocourek, The Legislative Function, in the Science of Legal Method, L–LI, LV; but cf. Chesterton, What's Wrong With The World, 282-283.

[9] Cf. Commissioner v. Marshall, 2 Cir., 125 F.2d 943, 946.

[10] Cf. concurring opinion of Stone, J., in Willing v. Chicago Auditorium Association, 277 U.S. 274, 290, 291, 48 S.Ct. 507, 72 L.Ed. 880.

trial court judges, is both a cause and a result of this over-emphasis on the rule-aspect of decisions.[11] Such judicial legislation as inheres in formulating legal rules is inescapable.[12] But courts should be modest in their legislative efforts to control the future, since they cannot function democratically, as legislative committees and administrative agencies can, by inviting the views of all who may be affected by their prospective rules. And, because they do not learn those views, and must largely rely on their own imaginations, they should be cautious about attempting, in present cases, to project their formulations too far and too firmly into the days yet to come. To cope with the present is none too easy, in part because the present is only a moving line dividing yesterdays and tomorrows, so that reflections on what will happen are unavoidable elements of current problems. But, although continuity, both backwards and forwards, is to some extent a necessity, judges should not shirk the present aspect of today's problems in favor of too much illusory tinkering with tomorrow's.[13] The future can become as perniciously tyrannical as the past. Posterity-worship can be as bad as ancestor-worship.[14]

Dean Leon Green's tentative analysis of the factors which affect upper court decisions helps to reveal the extent to which the judges of those courts, when deciding cases, often interest themselves in the future at the expense of the present.[15] He refers to (1) the "administrative" factor, (2) the "ethical or moral" factor, (3) the "economic" factor (4) the "prophylactic or preventive" factor, and (5) the "justice" factor (the "merits" of the particular case). The "administrative" factor, for instance, relates to "the workability" of a rule, its "ease and certainty of performance" in the future. Thus we find courts saying that, if recovery were allowed "in this class of cases, it would naturally result in a flood of litigation in cases where the injury complained of may be easily feigned without detection";[16] or that "in practice it is impossible satisfactorily to administer any other rule";[17] or that a rule "is an arbitrary exception, based upon a notion of what is practicable."[18] The "prophylactic" factor, bred of a desire of judges "to fashion rules for a healthy future," is frequently operative, for "judges are inveterate prophets and legislators"; they "scale their penalties, they impose damages, both punitive and exemplary, not merely for the individual offender's lesson, but as a preventive of future harms"; they "spend much time fashioning prophylactic rules both of substantive and procedural design in their efforts to purify the social stream through the judicial process."[19] Those and similar factors are undeniably important. But it is not always fortunate when judges tend first to consider such factors before turning their attention to the parties to the particular actual cases which they are called upon to decide.

The elaborate (and sometimes fatuous) concern with the future potentialities of ex-

---

[11] Cf. Green, Judge and Jury (1930), 91–92; United States v. Forness, 2 Cir., 125 F.2d 928.

[12] See, Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, third paragraph of note 4, for a discussion of the view that fact-findings in specific cases involves a kind of judicial legislation.

[13] It is noteworthy that in constitutional cases, where there is a peculiar necessity of regarding the interests of those who are not parties to the suits which raise constitutional questions, the Supreme Court has increasingly given less and less weight to stare decisis, recognizing the need for adaptation to changing circumstances. Cf. Graves v. Schmidlapp, March 30, 1942, 62 S.Ct. 870, 86 L. Ed. 1097.

[14] The problem can be restated, in age-old terms, as that of reconciling the need for generality in legal rules and the need for the individualization of—or equitable treatment—of specific cases. Cf. Aristotle, Rhetoric, Bk. 1, Ch. 13, 1374a, 25 to 1374b, 22; Bk. 1, Ch. 2, 1356b, 31–32;

Aristotle, Nicomachear Ethics, Bk. 5, Ch. 10; Aristotle, Politics, Bk. 3, Ch. 16, 1287a 15–29; Kiss, Law and Equity, in the Science of Legal Method (transl. 1917) 146, 151–152; Demogue, Analysis of Fundamental Notions, in Modern French Legal Philosophy (transl. 1916) 345, 481.

[15] Green, loc. cit. 76, 77 et seq.

[16] Mitchell v. Rochester Ry. Co., 151 N.Y. 107, 110, 45 N.E. 354, 34 L.R.A. 781, 56 Am.St.Rep. 604.

[17] Spade v. Lynn & Boston R. Co., 168 Mass. 285, 288, 47 N.E. 88, 89, 38 L.R. A. 512, 60 Am.St.Rep. 393.

[18] Holmes, C. J., in Homans v. Boston El. Ry. Co., 180 Mass. 456, 457, 62 N. E. 737, 57 L.R.A. 291, 91 Am.St.Rep. 324.

[19] Green, loc. cit., 98. He cites MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440; and Priestly v. Fowler, 1837, 3 Mees. & W. as striking illustrations.

pressions in judicial opinions, which accompany and justify specific decisions is, in considerable measure, due to uncritical veneration of the doctrine of "standing by the precedents"; for, if an opinion does, in truth, lay down rules which must thereafter be followed by the courts themselves in later cases, the responsibility in deciding existing controversies is far greater than that of being fair to the parties to those controversies, for then a judge is playing the important role of legislator. That responsibility, however, can be too much underscored.

Stare decisis, within limits, has undeniable worth. As we said recently, "Of course, courts should be exceedingly cautious in disturbing (at least retrospectively) precedents in reliance on which men may have importantly changed their positions."[20] As I have said elsewhere, "undeniably, in order to achieve impartial administration of justice, 'equality before the law,' and legal certainty, as far as is practicable, it is im-

portant, generally, that a court should not deviate, except prospectively, from its own decision in a prior case, even if that decision was in error, especially where such deviation will harm persons who acted in reliance upon that decision—as, for instance, a decision assigning specific legal consequences to specific words in a deed or lease."[21] But precedent-worship has been so unreflective that there has been insufficient inquiry into its practical workings. There is need to apply to it more of that constructive scepticism voiced by Wigmore twenty-five years ago.[22] We have paid too little heed to the way in which John Chipman Gray—a successful practicing lawyer in the field of real property where, above all, precedent has been traditionally sanctified—challenged the fundamental thesis of stare decisis when he said that few men, in the conduct of their practical affairs, actually rely on past judicial rulings.[23] Perhaps his scepticism went too far. Yet, in the twenty years which have elapsed since he issued that challenge,

[20] In re Barnett, 2 Cir., 124 F.2d 1005, 1011. Cf. Hammond-Knowlton v. United States, 2 Cir., 121 F.2d 192, 204, where we quoted Dicey: "If the Courts were to apply to the decision of substantially the same case one principle today and another tomorrow, men would lose rights they already possessed."

But, as we also there noted, some of the pressure for stare decisis stems from the desire of lawyers to protect their vested interest in their laboriously acquired knowledge of previous judicial rulings. See Wigmore's remarks quoted in the Barnett case, supra, at 1011, and also note 15.

Here the influence of the legal profession is of importance. Cf. Seagle, The Quest for Law (1941) Ch. XI.

[21] In re Marine Harbor Properties, Inc., 2 Cir., 125 F.2d 296, 299, 300.

[22] The Judicial Function, in The Science of Legal Method, Editorial Introduction (1917), XXXVI–XXXIX. Wigmore questions whether stare decisis has afforded the certainty which it is supposed to guaranty. And he makes this incisive comment: "Equality is not a product for which stare decisis is necessary. Equality is something desired for the persons now under the law; it does not call for sameness of treatment between those of the present and those of the past or the future generation. Gompers need not receive equal law with Hampden or with the citizen of Utopia, provided he receives equal law with Harriman. Allowing, therefore, a short time before and after now as necessary for the consciousness of equality with our own

generation, equality calls for no longer period of stare decisis."

[23] "Practically, in its application to actual affairs, for most of the laity, the law, except for a few crude notions of the equity involved in some of its general principles, is all ex post facto. When a man marries, or enters into a partnership, or engages in any other transaction, he has the vaguest possible idea of the law governing the situation, and with our complicated system of jurisprudence, it is impossible it should be otherwise. If he delayed to make a contract or do an act until he understood exactly all the consequences it involved, the contract would never be made or the act done. Now the law of which a man has no knowledge is the same to him as if it did not exist." Gray, The Nature and Sources of Law (1921) s. 225. Cf. Austin, Jurisprudence, 4th Ed., 674.

Doubtless where lawyers draft instruments, there is reliance on the decisions as interpreted by the lawyers. Our larger institutions probably therefore are often reliers. But the great majority of men seldom consult lawyers before acting. Perhaps, even so, some vague knowledge of what the courts have decided filters through to them, but no one knows how much.

Patterson, who is keenly aware of the relatively small amount of actual reliance, seems, at times, to imply that, nevertheless, the judicial formulations often reflect community attitudes; but that implication appears to be a matter of faith not of proof. But he concludes that "definite rules and precedents have guidance

few persons have met it, and most lawyers and many judges go on declaiming that life would be unbearably uncertain if courts did not adhere to their earlier formulations of "rules" and "principles." We know virtually nothing of the extent to which men do, in fact, rely on past judicial utterances. If, as is often said, stare decisis is bottomed on something like estoppel, courts should not be too hesitant about changing their previous formulations when change is highly desirable, in the absence of proof of actual reliance by the litigant who opposes such a change. It might be well to hold that such reliance will be presumed but that that presumption is rebuttable. And, in any event,

such changes, as Wigmore suggested, can be made prospective, and not retroactive, where there is any likelihood that there was reliance.[24] If the sanctity of stare decisis were thus moderately diminished, and if authorities were employed as they were by the much abused scholastics, i. e., only when shown to be reasonable,[25] upper court judges might lose some of their prestige, but they could, by reducing their Jovian aloofness, devote more time to the interests of litigants in specific actual cases and less to the possible future harm of "just" decisions of those actual controversies.[26]

Fortunately, wise judges have devised escapes from improvidently formulated rul-

value, if not for laymen, at least for lawyers and judges in the orderly functioning of the law." Constructive Conditions in Contracts, 42 Col.L.Rev. (1942) 903, 954. Is his reference, so far as it relates to lawyers, to their vested interests in their acquired knowledge or to the reliance of clients on their lawyers? And, so far as he refers to judges, does he have in mind what Green calls the "administrative factor"?

[24] Wigmore, loc, cit.; cf. Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 365, 366, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254; People v. Maughs, 149 Cal. 253, 86 P. 187; People v. Ryan, 152 Cal. 364, 92 P. 853; Cardozo, The Nature of The Judicial Process, 146–149.

The new rule could be made applicable, as Wigmore suggests, to cases arising after a given date, or to future cases in which there is no proof of actual reliance on the old rule.

Prospective over-ruling would relieve the courts of the embarrassment which retroactive over-ruling now occasions. For a recent reference to such embarrassment, see dissenting opinion of Mr. Justice Jackson in State Tax Comm. of Utah v. Aldrich, April 27, 1942, 62 S. Ct. 1008, 86 L.Ed. —.

[25] "But the common criticism that scholastic problems were solved by reference only to authority is without foundation; a good scholastic was one who could find authority for either side of a question and who was convinced further that truth could be discovered best by examining the interplay of such possible contradictory statements. Authority was only the reason of past thinkers solidified in brief statements, and if reason could not be found for it, the opinion could not be held. Authority, as one of the scholastics remarked, has a nose of wax: it may be turned in any direction whatsoever unless it is fortified by reason." 1 McKeon, Selections from Medieval Philos-

ophers (1929), General Introduction, XV. Roger Bacon said that one of the "four chief hindrances to the understanding of truth" is "the example of frail and unsuited authority."

It is of interest that Hobbe's criticism of the uncritical use of authorities, including Aristotle, on the ground that "the praise of ancient authors proceeds not from the reverence of the dead, but from the competition and mutual envy of the living," is a sort of echo of Aristotle himself. See Hobbes, Leviathan (1651) 395; Aristotle, Rhetoric, Bk. 2, Ch. 10, 1388b, 4–10.

I confess that, at one time, I voiced the conventional comments on scholastic thinking.

[26] The word "just" is, of course, ambiguous. What is meant here by "just" is more adequate consideration of the specific facts of specific cases.

Of course the selection of the relevant "facts" of a case is not a simple process, especially where the evidence is conflicting. The choice of a pertinent legal rule may affect the selection of the "facts," and vice versa. The inter-action of those two choices may be highly complicated. And the process may not always be 100% conscious; intuition often plays an important role. Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220 and note 46.

In this connection, it is tempting, but unsound, to classify judges as those who are stimulated primarily by rules—i. e., the general aspects of cases—and those who are activated primarily by particulars. Such a classification recalls Maurois' description of the differences between Gladstone and Disraeli: "Gladstone liked to choose an abstract principle and from that to deduce his preferences. Disraeli had a horror of abstract principles. He liked certain ideas because they appealed to his imagination. He left to action the care of putting them to the test. When Disraeli changed his views,

ings.[27] For instance, the courts have recognized the fact that chance circumstances—such as the peculiar interests of the parties to a suit[28] or the laziness or incompetence of their lawyers[29]—may prevent the adequate presentation of all the aspects of a case and thus induce judicial neglect of those aspects, with resultant inadequacy in the judicial generalizations.[30] So the Supreme Court has wisely said, "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." [31]

But, no matter what is done, the problem of deciding cases so that decisions will not be hurtful, as precedents, to future litigants, is not too easy of solution. It is surprising, then, that my colleagues, who like all judges, seek, every day, as they must, to solve that difficult problem, refuse, in the case at bar, to tackle a problem the solution of which is far simpler and with results far more easily foreseeable: Here the question is not of the future consequences, on litigants in possible future suits, of a general rule articulated in an opinion accompanying a decision, but of how a decision as to the specific rights of a particular person before the court may affect others not in court against whom that same person may,

in the future, attempt to assert those very rights. It resembles the question of revoking the license to drive an automobile of a man who has been proved to be an incompetent driver: In deciding whether that specific man should be permitted to drive in the future, it is necessary to consider those who may be injured by his future conduct if his license is not revoked, and the precedential effect of the decision on future litigation, not relating in any way to that specific man, is, relatively, unimportant. The public interest in his later activities should be a paramount consideration. His potential future victims are not present, and, for that very reason, their interests should be a major concern of the tribunal called upon to render decision.

Consequently, if we must here choose between deciding that the patent is not valid or is not infringed—a choice I think we are not required to make—our choice should be the former. By such a choice, we will do no harm to the patent system. It is under fire today, and may not survive attack unless its major abuses are removed. Among such abuses is the persistence of cancerous "spurious" patents.[32] To shift the metaphor, they are vicious Zombis. Their attacks on the public interest bring the patent system into disrepute.

he admitted the change and was ready to appear changeable; Gladstone fastened his constancy to blades of straw and thought they were planks. * * * Disraeli, the doctrinaire, prided himself on being an opportunist; Gladstone, the opportunist, prided himself on being a doctrinaire." Whether such clear-cut differences between those two men actually existed may be doubted. But assuming that they did, it might be said that every judge is in part a Gladstone and in part a Disraeli. The percentage of those components seems to vary from judge to judge—and even in a particular judge from time to time.

[27] Permitting arguments to be made by "friends of the court" is one device often helpful in preventing such improvident rulings.

[28] It has been said (perhaps not correctly) that, on occasions, neither side mentions a point because it is to the self-interest of both not to have it judicially decided.

[29] Cf. Quong Wing v. Kirkendall, 223 U.S. 59, 64, 32 S.Ct. 192, 56 L.Ed. 350; In re Barnett, 2 Cir., 124 F.2d 1005, 1006.

[30] Macaulay stated the conventional attitude when he said "that a tribunal will decide a judicial question most fairly when it has heard two able men argue,

as unfairly as possible, on the two opposite sides of it. * * * Sometimes, it is true, superior eloquence and dexterity will make the worse appear the better reason; but it is at least certain that the judge will be compelled to contemplate the case under two different aspects. It is certain that no important consideration will altogether escape note." Essay on History (1828).

Undoubtedly, the usual two-sided contentious mode of court procedure does often help to bring out most of the points. In re Barnett, supra, 124 F.2d at page 1011. But, for the reasons noted above, in the text, that is not what invariably happens in law suits.

Moreover, there are sometimes more than "two different aspects" of a case. As Demogue suggests, the "duellistic" nature of litigation may create a false dualistic attitude towards the facts or the pertinent legal rules. Demogue, loc. cit., 397, 565. Cf. Green, loc. cit. 27 note 2, 197, 198.

[31] Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411; KVOS, Inc., v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183; Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 216.

[32] Cf. Woodward, loc. cit.